Andy D. Birchfield, Jr. (pro hac vice)
Jennifer K. Emmel (pro hac vice)
Joseph G. VanZandt (pro hac vice)
Clinton Richardson (*pro hac vice*)
**BEASLEY ALLEN CROW**
**METHVIN PORTIS & MILES, LLC**
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Email: Andy.Birchfield@BeasleyAllen.com
Email: Jennifer.Emmel@BeasleyAllen.com
Email: Joseph.VanZandt@BeasleyAllen.com
Email: Clinton.Richardson@BeasleyAllen.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| **IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION** | **Case No. 4:22-md-03047-YGR** |
| | **MDL No. 3047** |
| **This Document Relates to:** | **Hon. Yvonne Gonzalez Rogers** |
| VERONICA HICKS, individually and as next friend to minor plaintiff D.M., | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Plaintiff, | |
| v. | |
| META PLATFORMS, INC., FACEBOOK HOLDINGS, LLC, FACEBOOK OPERATIONS, LLC, FACEBOOK PAYMENTS, INC., FACEBOOK TECHNOLOGIES, LLC, INSTAGRAM, LLC, SICULUS, INC., TIKTOK, INC., & BYTEDANCE, INC., | |
| Defendants. | |

COMPLAINT

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................... 3

II.     JURISDICTION AND VENUE ............................................................. 6

III.    PARTIES ............................................................................................... 7

IV.     GENERAL FACTUAL ALLEGATIONS ........................................... 26

        A.      Teenagers Are Particularly Vulnerable to the Perils of Excessive
                Social Media Use ..................................................................... 26

        B.      Unknown and Innumerable Product Defects ............................ 35

        C.      Defendants Knowingly Exploit Teenage Vulnerabilities for Unjust
                Gain .......................................................................................... 36

        D.      Defendants' Business Models Encourage Problematic Use to
                Maximize Screen Time, Thereby Increasing Revenue ................. 37

        E.      Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold
                Defendants Liable as the Publisher or Speaker of Any Content
                Provided, Posted, or Created by Third Parties ................................ 38

V.      PLAINTIFF-SPECIFIC ALLEGATIONS ......................................... 39

VI.     CAUSES OF ACTION ....................................................................... 42

VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS ................. 116

VIII.   DEMAND FOR A JURY TRIAL ..................................................... 116

IX.     PRAYER FOR RELIEF .................................................................... 117

COMPLAINT

# I.    INTRODUCTION

1.    This matter arises from an egregious breach of the public trust by Defendants Meta Platforms, Inc. (hereinafter, "Meta Platforms"), Facebook Holdings, LLC (hereinafter, "Facebook 1"), Facebook Operations, LLC (hereinafter, "Facebook 2"), Facebook Payments, Inc. (hereinafter, "Facebook 3"), Facebook Technologies, LLC (hereinafter, "Facebook 4"), Instagram, LLC (hereinafter, "Instagram"), Siculus, Inc. (hereinafter, "Siculus" and, collectively—including Facebook 1, Facebook 2, Facebook 3, Facebook 4, Instagram, and Siculus—"Meta"), together with TikTok, Inc. (hereinafter, "TikTok") and ByteDance, Inc (hereinafter, "ByteDance") (hereinafter, collectively, "Non-Meta," and, together with "Meta," "Defendants").

2.    Over the last two decades, more and more of our lives have moved onto social media platforms and other digital public spaces. In this vast, still largely unregulated universe of digital public spaces, which are privately owned and primarily run for profit, there exists tension between what is best for technology companies' profit margins and what is best for the individual user (especially the predictable adolescent user) and for society. Business models are often built around maximizing user engagement, without regard to whether users engage with the platform and one another in safe and healthy ways. Technology companies focus on maximizing time spent, not time well spent. In recent years, there has been growing concern about the impact of digital technologies, particularly social media, on the mental health and wellbeing of adolescents. Many researchers argue that Defendants' social media products facilitate cyberbullying, contributes to obesity and eating disorders, instigates sleep deprivation to achieve around-the-clock platform engagement, encourages children to negatively compare themselves to others and develop a broad discontentment for life, and has been connected to depression, anxiety, self-harm, and ultimately suicidal ideation, suicide attempts, and completed suicide.

3.    Defendants have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by advanced

computer algorithms and artificial intelligence available to two of the largest technology companies in the world. Defendants have progressively modified their products to promote problematic and excessive use that they know threatens the actuation of addictive and self-destructive behavioral patterns.

4.      Excessive screen time is harmful to adolescents' mental health, sleep patterns, emotional well-being. Defendants' products lack any warnings that foreseeable product use can disrupt healthy sleep patterns, or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours, rendering the platforms unreasonably dangerous. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

5.      Defendants do not charge their users to use their platforms, but instead receive money from advertisers who pay a premium to target advertisements to specific categories of people as studied and sorted by Defendants' algorithms. Thus, Defendants generate revenue based upon the total time spent on the application, which directly correlates with the number of advertisements that can be shown to each user.

6.      Rather than making meaningful changes to safeguard the health and safety of its users, Defendants have consistently chosen to prioritize profit over safety by continuing to implement and require its users to submit to product components that increase the frequency and duration of users' engagement, resulting in the pernicious harms described in greater detail below.

7.      Plaintiff brings claims of strict liability based upon Defendants' defective design of their social media products that renders such products not reasonably safe for ordinary consumers in general and minors in particular. It is technologically feasible to design social media products

COMPLAINT

that substantially decrease the incidence and magnitude of harm to ordinary consumers and minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost. It is also technologically feasible to design and implement effective age and identity verification protocols to ensure that only children of an appropriate age may have access to these products.

8.    Plaintiff also brings claims for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms arising from the foreseeable use of their social media products.

9.    Plaintiff also brings claims for common law negligence arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew or, in the exercise of ordinary care, should have known that their social media products were harmful to a significant percentage of their minor users and failed to re-design their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate safeguards from the harmful effects they knew were occurring.

10.    As is now generally known, in Fall 2021, Frances Haugen, a former Facebook employee turned whistleblower, came forward with internal documents showing that Meta was aware that its platforms and products cause significant harm to its users, especially our children. Non-Meta Defendants' products—their social media platforms—have similar designs and mechanism of action resulting in similar addictive qualities and harmful outcome to minor users. To this day, the addictive qualities of Defendants' products and their harmful algorithms are not fully known or understood by minor users or their parents.

COMPLAINT

## II.    JURISDICTION AND VENUE

11.    This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

12.    This Court has specific personal jurisdiction over Defendants because these Defendants transact business in the State of Kansas and the State of California, and purposely avail themselves of the benefits of transacting business with Kansas and California residents. Plaintiff's claims set forth herein arise out of and/or relate to Defendants' activities in the State of Kansas and purposeful availment of the benefits of transacting business here and the exercise of personal jurisdiction by this Court comports with traditional notions of fair play and substantial justice.

13.    Defendants interface with a significant percentage of the population of the State of Kansas relating to use of the products at issue in this case, and interact extensively with—send messages, notifications, and communications to—and provide a myriad of other interactive services and recommendations to users Defendants expect and know to be in the State of Kansas.

14.    Defendants advertise extensively in Kansas, through contractual relationships with third-party "partners" who advertise on their behalf via electronic and internet-based platforms and devices. Defendants also have agreements with cell phone manufacturers and/or providers and/or retailers, who often pre-install its products on mobile devices prior to sale and without regard to the age of the intended user of each such device. That is, even though Defendants are prohibited from providing their products to users under the age of 13, by encouraging and allowing their products to be installed indiscriminately on mobile devices, Defendants actively promote and provide access to their products to the underage users in Kansas for whom those devices are intended.

COMPLAINT

15.    Defendants have earned millions of dollars in annual revenue from their Kansas-related activities over the last several years arising from the use of their defective and inherently dangerous social media products by Kansas residents, including Plaintiff.

16.    Venue is proper in this District pursuant to the consolidation of this lawsuit and others for pretrial proceedings in the Northern District of California, Oakland Division. *See* Order Setting Initial Conference, *In re Social Media Adolescent Addiction/Personal Injury Product Liability Litigation*, MDL No. 3047, No. 4:22-md-3047-YGR, ECF No. 2. Several of Defendants' principal places of business are also located in the Northern District of California.

### III.    PARTIES

**<u>Plaintiff</u>**

17.    Plaintiff Veronica Hicks is an adult individual domiciled in Junction City, Kansas, and the custodial parent of her seventeen-year-old son D.M. Junction City, Kansas, is Plaintiffs' true, fixed, and permanent home and principal establishment, to which Plaintiffs have the intention of returning whenever they are absent therefrom. Plaintiffs intend to remain in Junction City, Kansas, indefinitely. Plaintiff brings this suit on behalf of herself and on behalf of D.M., pursuant to FED. R. CIV. P. 17.

**<u>Defendant Meta Platforms, Inc.</u>**

18.    Meta Platforms is multinational technology conglomerate, having its principal place of business in Menlo Park, California. Meta develops and maintains social media platforms, communication platforms, and electronic devices.[1] Meta Platforms was originally incorporated in Delaware on July 29, 2004, as "TheFacebook, Inc." On September 20, 2005, the company changed

---

[1] These platforms and products include Facebook (its self-titled app, Messenger, Messenger Kids, Marketplace, Workplace, etc.), Instagram (and its self-titled app), and a line of electronic virtual reality devices called Oculus Quest (soon to be renamed "Meta Quest").

COMPLAINT

its name to "Facebook, Inc." On October 28, 2021, the company assumed its current designation. While Plaintiff has attempted to identify the specific Meta Platforms subsidiary(s) that committed each of the acts alleged in this Complaint, Plaintiff was not always able to do so, in large part due to ambiguities in Meta Platforms' and its subsidiaries' own documents, public representations, and lack of public information. However, upon information and belief, Meta Platforms oversees the operations of its various platforms and subsidiaries, some of which have been identified and are listed below. For this reason, unless otherwise specified, the shorthand "Meta" contemplates the apparent control that Meta Platforms wields over its subsidiaries' overall operations and, therefore, further refers to its various subsidiaries and predecessors. To the extent this assumption is incorrect, the knowledge of which Meta Platforms subsidiary, current or former, is responsible for specific conduct is knowledge solely within Meta's possession, the details of which Plaintiff should be permitted to elucidate during the discovery phase.

19.    Meta Platforms' subsidiaries include but may not be limited to: Facebook 1 (Delaware); Facebook 2 (Delaware); Facebook 3 (Delaware); Facebook 4 (Delaware); FCL Tech Limited (Ireland); Instagram (Delaware); Novi Financial, Inc. (Delaware); Runways Information Services Limited (Ireland); Scout Development LLC (Delaware); Siculus (Delaware); and a dozen other entities whose identity or relevance is presently unclear.

**Subsidiary Meta Defendants**

20.    Facebook 1 was incorporated in Delaware on March 11, 2020, and is a wholly owned subsidiary of Meta Platforms. Facebook 1 is primarily a holding company for entities involved in Meta Platforms' supporting and international endeavors, and its principal place of business is in Menlo Park, California. Meta Platforms is the sole member of this LLC Defendant.

COMPLAINT

21.    Facebook 2 was incorporated in Delaware on January 8, 2012, and is a wholly owned subsidiary of Meta Platforms. Facebook 2 is likely a managing entity for Meta Platforms' other subsidiaries, and its principal place of business is in Menlo Park, California. Meta Platforms is the sole member of this LLC Defendant.

22.    Facebook 3 was incorporated in Florida on December 10, 2010, and is a wholly owned subsidiary of Meta Platforms. Facebook 3 manages, secures, and processes payments made through Meta Platforms, among other activities, and its principal place of business is in Menlo Park, California.

23.    Facebook 4 was incorporated in Delaware as "Oculus VR, LLC" on March 21, 2014, and acquired by Meta Platforms on March 25, 2014. Facebook 4's principal place of business is in Menlo Park, California, and it develops Meta Platforms' virtual and augmented reality technology, such as the Oculus Quest line of products (soon to be renamed "Meta Quest"), among other technologies related to Meta Platforms' various platforms. Meta Platforms is the sole member of this LLC Defendant.

24.    Instagram was founded by Kevin Systrom and Mike Krieger in October 2010. In April 2012, Meta Platforms purchased the company for $1 billion (later statements from Meta Platforms have indicated the purchase price was closer to $2 billion). Meta Platforms reincorporated the company on April 7, 2012, in Delaware. Currently, the company's principal place of business is in in Menlo Park, CA. Instagram is a social media platform tailored for photo and video sharing. Meta Platforms is the sole member of this LLC Defendant.

25.    Siculus was incorporated in Delaware on October 19, 2011, and is a wholly owned subsidiary of Meta Platforms. Siculus supports Meta by constructing data facilities and other projects. Siculus's principal place of business is in Menlo Park, CA.

26.    By admission, Facebook and Instagram are products (Meta's Vice President of Messaging Products Loredana Crisan, *Celebrating 10 Years of Messenger With New Features* (August 25, 2021, last visited July 29, 2022, at 1:10 PM CST) https://about.fb.com/news/2021/08/messenger-10th-birthday/ ), the safety of which of was not duly addressed prior to public distribution (*Our Progress Addressing Challenges and Innovating Responsibly* (September 21, 2021, last visited July 29, 2022, at 1:17 PM CST) https://about.fb.com/news/2021/09/our-progress-addressing-challenges-and-innovating-responsibly/ ).

27.    Meta knowingly exploited its most vulnerable users—children throughout the world—to drive corporate profit. Meta operates the world's largest family of social networks, enabling billions of users worldwide to connect, view, and share content through mobile devices, personal computers, and virtual reality headsets. A user does not have to pay to create an account. Instead of charging account holders to access the platform, Meta became one of the world's most valuable companies from the sale of advertisement placements to marketers across its various platforms and applications. For example, upon information and belief, Meta generated $69.7 billion from advertising in 2019, more than 98% of its total revenue for the year. Meta can generate such revenues by marketing its user base to advertisers. Meta collects and analyzes data to assemble virtual dossiers on its users, covering hundreds if not thousands of user-specific data segments. This data collection and analysis allows advertisers to micro-target advertising and advertising dollars to very specific categories of users, who can be segregated into pools or lists using Meta's data segments. Only a fraction of these data segments come from content that is explicitly designated by users for publication or explicitly provided by users in their account profiles. Many of these data segments are collected by Meta through surveillance of each user's

COMPLAINT

activity on the platform and off the platform, including behavioral surveillance that users are not even aware of, like navigation paths, watch time, and hover time. At bottom, the larger Meta's user database grows, the more time the users spend on the database, and the more detailed information that Meta can extract from its users, the more money Meta makes.

28.    As of October 2021, Facebook had roughly 2.91 billion monthly active users, thus reaching 59% of the world's social networking population, the only social media platform to reach over half of all social media users. Instagram has become the most popular photo sharing social media platform amongst teenagers and young adults in the United States, with over 57 million users below the age of eighteen, meaning that 72 percent of America's youth use Instagram. 11 percent of parents in the U.S. know their child between the ages of 9 and 11 uses Instagram.[2] Likewise, 6 percent of parents in the U.S. know their child between the ages of 9 and 11 uses Facebook.[3]

29.    Two Meta products, the www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram") websites and respective interrelated apps (collectively "Meta 2"), rank among the most popular social networking products, with more than two billion combined users worldwide. It is estimated that nine out of ten teens use social media platforms, with the average teen using the platforms roughly three hours per day. Given the delicate, developing nature of the teenage brain and Meta's creation of social media platforms designed to be addictive, it comes as no surprise that we are now grappling with the ramifications of Meta's growth-at-any-cost approach, to wit, a generation of children physiologically entrapped by

---

[2] Katherine Schaeffer, *7 facts about Americans and Instagram,* Pew Research Center (Oct. 7, 2021), https://www.pewresearch.org/fact-tank/2021/10/07/7-facts-about-americans-and-instagram/.
[3] *Id.*

COMPLAINT

—

products the effects of which collectively result in long-lasting adverse impact on their rapidly evolving and notoriously precarious mental health.

30.    Meta, as originally conceived, ostensibly functioned like an enormous virtual bulletin board, where content was published by authors. But Meta has evolved over time with the addition of numerous features and products designed by Meta to engage users. The earliest of these—the search function and the "like" button—were primarily user-controlled features. In more recent years, however, Meta has taken a more active role in shaping the user-experience on the platform with more complex features and products. The most visible of these are curated recommendations, which are pushed to each user in a steady stream as the user navigates the website, and in notifications sent to the user's smartphone and email addresses when the user is disengaged with the platform. These proprietary Meta products include News Feed (a newsfeed of stories and posts published on the platform, some of which are posted by your connections, and others that are suggested for you by Meta), People You May Know (introductions to persons with common connections or background), Suggested for You, Groups You Should Join, and Discover (recommendations for Meta groups to join). These curated and bundled recommendations are developed through sophisticated algorithms. As distinguished from the earliest search functions that were used to navigate websites during the Internet's infancy, Meta's algorithms are not based exclusively on user requests or even user inputs. Meta's algorithms combine the user's profile (e.g., the information posted by the user on the platform) and the user's dossier (the data collected and synthesized by Meta to which Meta assigns categorical designations), make assumptions about that user's interests and preferences, make predictions about what else might appeal to the user, and then make very specific recommendations of posts and pages to view and groups to visit and join based on rankings that will optimize Meta's key performance indicators.

COMPLAINT

31.    A user's "feed" on both Facebook and Instagram is comprised of an endless series of photos, videos, text captions, and comments posted by accounts that the user follows, along with advertising and content specifically selected and promoted by Instagram and Facebook.

32.    Instagram also features a "discover" page where a user is shown an endless feed of content that is selected by an algorithm designed by Instagram based upon the users' data profile: demographics, prior activity in the platform, and other data points. Meta has added similar features to Facebook on the apps "menu" and "watch" sections.

33.    Engineered to meet the evolving demands of the "attention economy,"[4] a term used to describe the supply and demand of a person's attention, which is a highly valuable commodity for internet websites, in February 2009, Meta introduced perhaps its most conspicuous effort to addict users—intermittent variable rewards ("IVR"): its "Like" button; Instagram launched that same year and came ready-made with a like function shaped as a heart. Additional features of Meta's IVR include its delay-burst notification system, comments, posts, shares, and other dopamine-triggering content. Instagram's notification algorithm delays notifications to deliver them in spaced-out, larger bursts. Facebook likely uses a similar feature. These designs take advantage of users' dopamine-driven desire for social validation and optimizes the balance of negative and positive feedback signals to addict users.

34.    IVR is a method used to addict a user to an activity by spacing out dopamine triggering stimuli with dopamine gaps—a method that allows for anticipation and craving to develop and strengthens the addiction with each payout. The easiest way to understand this term is by imagining a slot machine. You pull the lever (intermittent action) with the hope of winning a prize (variable reward). In the same way, you refresh Defendants' feeds, endure the brief delay,

---

[4] The business model is simple: The more attention a platform can pull from its users, the more effective its advertising space becomes, allowing it to charge advertisers more.

COMPLAINT

and then learn if anyone has tagged you in a photo, mentioned you in a post, sent you a message, or liked, commented on, or shared either of your posts. As explained below, Meta (and, upon information and belief, all Defendants) space out notifications into multiple bursts (dopamine gaps), rather than notifying users in real time, to maximize the platforms' addictiveness.

35.    Over the past decade or so, Meta has added features and promoted the use of auto-playing short videos and temporary posts on Facebook and Instagram, with the former being referred to as "Reels," while the latter is referred to as Instagram "Stories."

36.    Facebook and Instagram notify users through text and email of activity that might be of interest, which is designed to and does prompt users to open Facebook and Instagram and be exposed to content selected by the platforms to maximize the length of time and amount of content viewed by the user. Facebook and Instagram include many other harm causing features, as discussed below.

37.    Equipped with ample information about the risks of social media, the ineffectiveness of its age-verification protocols, and the mental processes of teens, Meta has expended significant effort to attract preteens to its products, including substantial investments in designing products that would appeal to children ages 10-to-12. Meta views pre-teens as a valuable, unharnessed commodity, so valuable that it has contemplated whether there is a way to engage children during play dates.[5] Meta's unabashed willingness to target children—in the face of its conscious, long-standing, plainly deficient age-verification protocols—demonstrates the depths to which Meta is willing to reach to maintain and increase its profit margin.

---

[5] Georgia Wells and Jeff Horwitz, *Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show* (2021), https://www.wsj.com/articles/facebook-instagram-kids-tweens-attract-11632849667.

COMPLAINT

38.     Faced with the potential for reduction in value due to its declining number of users, in or around early 2018, Meta (and likely Meta 2) revamped its interface to transition away from chronological ranking, which organized the interface according to when content was posted or sent, to prioritize Meaningful Social Interactions, or "MSI," which emphasizes users' connections' interactions, e.g., likes and comments, and gives greater significance to the interactions of connections that appeared to be the closest to users. To effectuate this objective, Facebook developed and employed an "amplification algorithm" to execute engagement-based ranking, which considers a post's likes, shares, and comments, as well as a respective user's past interactions with similar content, and exhibits the post in the user's newsfeed if it otherwise meets certain benchmarks. The algorithm covertly operates on the proposition that intense reactions invariably compel attention. As it measures reactions and contemporaneously immerses users in the most reactive content, and negative content routinely elicits passionate reactions, the algorithm effectively works to steer users toward the most negative content.

39.     Meta CEO Zuckerberg publicly recognized this in a 2018 post, in which he demonstrated the correlation between engagement and sensational content that is so extreme that it impinges upon Meta's own ethical limits, with the following chart:[6]

---

[6] Mark    Zuckerberg,    *A Blueprint for Content Governance and Enforcement*,    FACEBOOK, https://www.facebook.com/notes/751449002072082/ (last visited January 8, 2022).

COMPLAINT



40.    The algorithm controls what appears in each user's News Feed and promotes content that is objectionable and harmful to many users. In one internal report, Meta concluded that "[o]ur approach has had unhealthy side effects on important slices of public content, such as politics and news," with one data scientist noting that "[t]his is an increasing liability." In other internal memos, Meta concluded that because of the new algorithm, "[m]isinformation, toxicity, and violent content are inordinately prevalent." Other documents show that Meta employees also discussed Meta's motive for changing its algorithm—namely, that users began to interact less with the platform, which became a worrisome trend for Meta's bottom line. Meta found that the inflammatory content that the new algorithm was feeding to users fueled their return to the platform and led to more engagement, which, in turn, helped Meta sell more of the digital ads that generate most of its revenue. All told, Meta's algorithm optimizes for angry, divisive, and polarizing content because it'll increase its number of users and the time users stay on the platform per viewing session, which thereby increases its appeal to advertisers, thereby increasing its overall value and profitability.

41.    Upon information in belief, at least as far back as 2019, Meta initiated, *inter alia*, a Proactive Incident Response experiment, which began researching the effect of Meta on the mental

health of today's youth.[7] Meta's own in-depth analyses show significant mental-health issues stemming from the use of Instagram among teenage girls, many of whom linked suicidal thoughts and eating disorders to their experiences on the app.[8] Meta's researchers have repeatedly found that Instagram is harmful for a sizable percentage of teens that use the platform. In an internal presentation from 2019, Meta researchers concluded that "[w]e make body issues worse for one in three teen girls," and "[t]eens blame Instagram for increases in the rate of anxiety and depression." Similarly, in a March 2020 presentation posted to Meta's internal message board, researchers found that "[t]hirty-two percent of teen girls said that when they feel bad about their bodies, Instagram made them feel worse." Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of "suicide and self-injury" worse. Seventeen percent of teen-girl Instagram users say the platform makes "[e]ating issues" worse. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

42.    Meta is aware that teens often lack the ability to self-regulate. Meta is further aware that, despite the platforms' adverse impact to teenage users' well-being, the absence of impulse control often renders teens powerless to oppose the platforms' allure. Meta is conscious of the fact that the platform dramatically exacerbates bullying and other difficulties prevalent within the high school experience, as the reach of the same now affects users within the ideally otherwise safe confines of the home. The advent of social media largely occurred after today's parents became

---

[7] *See Protecting Kids Online: Testimony from a Facebook Whistleblower*, United States Senate Committee on Commerce, Science, & Transportation, Sub-Committee on Consumer Protection, Product Safety, and Data Security, https://www.c-span.org/video/?515042-1/whistleblower-frances-haugen-calls-congress-regulate-facebook.

[8] *See* Wall Street Journal Staff, *The Facebook Files,* WSJ (2021), https://www.wsj.com/articles/the-facebook-files-11631713039?mod=bigtop-breadcrumb.

COMPLAINT

adults, the consequence being a large swath of parents that lack the context needed to appreciate the contemporary perils of Meta and Instagram, who are likewise ill-equipped to offer advice sufficient to effectively mitigate against it.

43.     The shift from chronological ranking to the algorithm modified the social networking environment in such a way that it created a new iteration of the Meta experience, one that is profoundly more negative, one that exploits some of the known psychological vulnerabilities of Facebook's most susceptible patronage, to wit, juveniles, resulting in a markedly enlarged threat to the cohort's mental health and the related frequency of suicidal ideation.

44.     Meta professes to have implemented protective measures to counteract the well-established dangers of its sites' customized, doggedly harmful content; however, its protocols apply only to content conveyed in English and removes only three-to-five percent of harmful content. Meta knows its quality-control and age-verification protocols are woefully ineffective, but Meta is either unwilling or incapable of properly managing its platforms. This is consistent with its established pattern of recognizing, and subsequently ignoring, the needs of its underage users and its obligation to create a suitable environment accessible only by its age-appropriate users, all in the interest of reaping obscene profit.

45.     Instead of providing warnings at sign-up or during use, Meta provides no warning at all. Rather, the most accessible and full information regarding the mental and physical health risks of Meta's platforms comes from third parties. Meta has a "Youth Portal" website that does not appear to be widely promoted by Meta or even recommended to teen users on its platforms.[9] Although the website claims to be comprehensive in its coverage of safety information for the platforms, it fails to directly address any of the features or health risks listed above. The website

---

[9] *Safety Center*, Facebook, https://www.facebook.com/safety/youth (last visited Sept. 20, 2022)

COMPLAINT

states, "Welcome to our Youth Portal. Consider this your guide to all things Facebook: general tips, insider tricks, privacy and safety information, and everything else you need to have a great experience on Facebook. It's also a space for you to hear from people your age, in their own voices, about the issues that matter to them online. Take a look around — these resources were made specifically for you, your friends, and your real-life experiences online and off.".[10] The website merely provides instructional guides regarding mental health in general—it does not identify, warn, or take responsibility for the impact of the platform and its features on users' mental health. By contrast, it shifts blame to other factors, such as third parties posting "suicide challenges," the general societal issue of substance abuse, and the COVID-19 pandemic.

46.    The only content on the website that has a semblance of a warning for the issues listed above is a link to a "Family Digital Wellness Guide" created by the Boston Children's Hospital Digital Wellness Lab. Buried in this guide is a mention that screens should not be used an hour before bed, because "[u]sing screens before bedtime or naptime can excite kids and keep them from falling asleep. The 'blue light' that comes from TVs and other screen devices can disrupt your child's natural sleep cycle, making it harder for them to fall asleep and wake up naturally. . . . [Late screen use can] result[ ] in your child getting less sleep and struggling to wake up on time. On average, school-age children need 9-12 hrs of sleep each night."

47.    The "Family Digital Wellness Guide" only alludes to the platforms' manipulation, addictiveness, behavioral control, and data tracking of users: "Advertisers target children with lots of commercials, everything from sneakers and toys to unhealthy foods and snacks high in fat, sugar, and calories. Your children may also start becoming familiar with online influencers, who are also often paid to advertise different products and services on social media. Helping your child

---

[10] *Id.*

COMPLAINT

think critically about how advertising tries to change behaviors, helps your child understand the purpose of ads, and empowers them to make informed decisions." The guide also briefly discusses cyber bullying.

48.    Finally, the guide mentions the body image harms social media inflicts, but it solely blames influencers as the cause, rather than the platforms' algorithms and features, and asserts that the burden to remedy the issue is on parents, rather than social media companies. "Science says: Tweens are often exposed to a lot of information online and through other media, both true and false, about how bodies 'should' look and what they can do to 'improve' their appearance. Certain body types are often idolized, when in reality bodies are incredibly diverse. There are many online accounts, websites, and influencers that make youth feel inadequate by encouraging them to lose weight or build up muscle, harming both their mental and physical health. . . . Protip: Actively listen and show that you care about how your child is feeling about puberty and how their body is changing. Talk with them about images on social and other media as these often set unrealistic ideals, and help them understand that these images are often digitally altered or filtered so that people look more 'beautiful' than they really are." No similar warning is offered to young users in Meta's advertisements, at signup, or anywhere on the platform. Instead, Meta unreasonably and defectively leaves it to individuals' research ability for a user to be informed about the key dangers of their platforms.

49.    This informational report is from a third party, not Meta. Meta merely links to this information on a "Youth Portal" website in a location that is difficult and time-consuming to find. The is guide devoid of any mention of strong role that Facebook's and Instagram's individual or collective algorithm(s) and features play in each of these harms. Furthermore, it is uncertain how long even this limited information has been tethered by Meta.

COMPLAINT

50.    On another Meta created website that proposes to "help young people become empowered in a digital world," its "Wellness" subpage lists five activities, "mindful breathing," "finding support," "building resilience: finding silver linings," "a moment for me," and "taking a break.".[11] Nowhere does the website mention the mental health risks posed by Facebook and Instagram as a result of the product features listed above.

**Defendant TikTok, Inc.**

51.    TikTok is a California corporation with its principal place of business in Culver City, California. TikTok owns and operates the TikTok social media platform, an application that is widely marketed by TikTok and available to users throughout the United States. The primary feature of TikTok is its "For You" page, which presents users with an endless stream of algorithmically selected content. The primary objective of the platform is to maximize the frequency and length of each user's viewing sessions. 67 percent of teenagers in the U.S. actively use TikTok.[12] 30 percent of parents in the U.S. know their child between the ages of 9 and 11 uses TikTok.[13]

52.    TikTok is known as a video-sharing application, where users can create, share, and view short video clips, and is highly integrated with its Chinese parent company ByteDance. TikTok hosts a variety of short-form user videos from genres/themes like pranks, stunts, DIY ("Do It Yourself") tutorials, satire, opinions, dances, and entertainment, with durations from 15 seconds to ten minutes. TikTok has been downloaded more than 130 million times in the United States and is regarded as the most-visited website in 2021 according to some metrics.

---

[11] *Wellness*, Meta, https://www.facebook.com/fbgetdigital/youth/wellness (last visited Sept. 20, 2022).
[12] Vogels et al., *supra* note 13.
[13] Schaeffer, *supra* note 2.

COMPLAINT

53.     TikTok's revenue is heavily dependent on the amount of time users spend on the product and their level of engagement. The more time users spend on TikTok, the more advertising revenue TikTok reaps. Upon knowledge, information, and belief, formed after a reasonable inquiry under the circumstances, TikTok has designed its algorithms to addict users through advanced analytics that create a variable reward system, thereby causing users to spend increased amounts of time on the product. Upon opening the TikTok application, users are automatically shown an endless stream of videos selected by an algorithm(s). Further, TikTok markets itself as an artificial intelligence company:

> The most obvious clue is right there when you open the app: the first thing you see isn't a feed of your friends, but a page called 'For You.' It's an algorithmic feed based on videos you've interacted with, or even just watched. It never runs out of material. It is not, unless you train it to be, full of people you know, or things you've explicitly told it you want to see. It's full of things that you seem to have demonstrated you want to watch, *no matter what you actually say you want to watch* . . . Imagine a version of Facebook that was able to fill your feed before you'd friended a single person. That's TikTok. [14]

54.     TikTok's algorithms often work in concert with other social media platforms, like, Meta's. A teen may learn about a harmful topic through Meta's recommendation technologies on Instagram, which is feasibly subsequently identified by TikTok's algorithm(s), and TikTok will

---

[14] John Herman, *How TikTok is Rewriting the World*, N.Y. Times (Mar. 10, 2019), https://www.nytimes.com/2019/03/10/style/what-is-tik-tok.html (emphasis added).

COMPLAINT

then amplify and promote the same harm through a series of how-to videos. Like Meta, TikTok has tried to boost engagement and keep young users hooked to its social media product by any means necessary. Indeed, TikTok similarly sends push notifications and emails to encourage addictive behavior, to increase use of their product. TikTok's communications are triggered through information its algorithms collect about users, communications that are then "pushed" to users frequently throughout the day.

55.    Other product features that work in combination to cause addiction and other harms include: (1) a platform-imposed limit to the length of video content. Initially, the maximum video time was 60 seconds. The limit was later increased to 3 minutes and is currently 10 minutes. This limit is imposed to keep users in a flow-like focused state involving variety of content and variable rewards. A user is more likely to become bored and end their session during a long video than during several varying videos. Video length limits in defendants' platforms have conditioned users to have a shorter attention span across years of use. (2) Until a subsequent change, the TikTok app sent notifications to the devices of children well after normal bedtime hours, disrupting sleep patterns and causing psychological injury. Recently, TikTok reportedly stopped the platform from sending notifications to users between the age of 13 and 15 after 9 p.m. (3) The interface of TikTok positions buttons on the bottom right of the screen, to avoid the milliseconds of delay of discomfort that could disrupt the flow-like state of right-handed users tapping the like or comment buttons if placed elsewhere on the screen. (4) Unlike other platforms, TikTok continues to play a video's audio, and the top quarter of the video, while users view comments on the video. This design decision avoids disrupting a user's heightened focused "flow-state" of consuming TikTok content. (5) TikTok's interface places buttons and profiles overlaid on top of the videos, rather than in a separate area. This design prevents there from being any barrier between videos (such as a

COMPLAINT

horizontal bar across the screen on the bottom of one video and on top of the next) and prevents users from having any pause time between videos to evaluate whether they should continue using the app in that moment before more algorithmically selected content is played on their screen. (6) Videos automatically start playing as a user scrolls. Videos automatically restart once they conclude. In some circumstances, such as when a user sends a link of a video on TikTok to another user that views it in a web browsing app, the next video after that video will automatically play without the user scrolling. (7) Upon opening the app, users' view of the first video loaded is obstructed with a message saying "swipe for more" and a graphic of a hand and figure swiping up. The user must scroll down to see an unobstructed video. This design feature trains users to reflexively scroll to the next video once one video ends. Thus, addiction is initiated by the app before the user even sees the first piece of content.

56.    As research conducted by the Brown University School of Public Health has determined, these features work in concert to lull users into a hypnotic, hyper-focused "flow-like state":

> [T]he infinite scroll and variable reward pattern of TikTok likely increase the addictive quality of the app as they may induce a flow-like state for users that is characterized by a high degree of focus and productivity at the task at hand[ ]. Once immersed in the flow-like state, users may experience a distorted sense of time in which they do not realize how much time has passed. Furthermore, the app interface itself is straightforward and user-friendly, with only a limited number of buttons and sections of the app for users to navigate, which further enables entrance into "flow." . . . When they

COMPLAINT

play, they consume the entire device screen, which creates an immersive experience for users. . . .  Although the similarity may not be immediately evident, analysis of social media apps reveals that they are designed to function like slot machines — the "swipe down" feature required to refresh one's feed mirrors pulling a slot machine lever, and the variable pattern of reward in the form of entertaining videos on TikTok simulates the intermittent reward pattern of winning or losing on a slot machine; this pattern keeps individuals engaged under the impression that the next play might be "the one." . . . Provided that social media apps are functionally akin to slot machines, it is likely that the use of these apps is just as addictive as slot machines and fosters social media addiction, much like how slot machines contribute to gambling addiction. [15]

57.     Other researchers have described the fine-tuned TikTok experience as hypnosis. "You'll just be in this pleasurable dopamine state, carried away. It's almost hypnotic, you'll keep watching and watching. . . .You keep scrolling, she says, because sometimes you see something you like, and sometimes you don't. And that differentiation—very similar to a slot machine in Vegas—is key." [16] TikTok also provides its own set of beauty enhancing filters, which cause

---

[15] *What Makes TikTok so Addictive?: An Analysis of the Mechanisms Underlying the World's Latest Social Media Craze*, Brown Undergraduate J. of Pub. Health (2021), https://sites.brown.edu/publichealthjournal/2021/12/13/tiktok/.

[16] John Koetsier, *Digital Crack Cocaine: The Science Behind TikTok's Success*, Forbes (Jan. 18, 2020 at 2:04 PM EST),     https://www.forbes.com/sites/johnkoetsier/2020/01/18/digital-crack-cocaine-the-science-behind-tiktoks-success/?sh=4bcc645f78be.

COMPLAINT

insecurities and psychological injury in teens leading to body dysmorphia, eating disorder, self-harm, and in more severe cases, suicide.

**Defendant ByteDance, Inc.**

58.     ByteDance is a Delaware corporation with its principal place of business in Mountain View, California. ByteDance owns and/or operates TikTok, and owns and/or operates the TikTok social medial platform, an application that is widely marketed by TikTok and available to users throughout the United States.

## IV.    GENERAL FACTUAL ALLEGATIONS

**A.    Teenagers Are Particularly Vulnerable to the Perils of Excessive Social Media Use**

59.     Emerging research shows that the human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotion regulation, and impulse control. The frontal lobes—and, in particular, the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature. During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of

the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood. In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

60.    Because adolescence is the period when sophisticated, essential inhibitory control functions are being established, the onset of prolonged exposure to toxic content during adolescence is particularly concerning. The extended development of the prefrontal cortex results in an adolescent brain that is largely undeveloped, highly malleable, and overwhelmingly vulnerable to long-term, irremediable effects of adverse influences, including addiction and a fractured psychological well-being.

61.    The algorithms in Defendants' social media products exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, such users are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants have failed to design their products with any protections to account for and ameliorate the psychosocial immaturity of their minor users.

62.    Adolescents see themselves as increasingly unique. Paradoxically, as part of their individuation, they conform by faithfully mimicking the behavior of peers. Indeed, in defining

COMPLAINT

their own emerging identity, adolescents aspire to be viewed as mature adults, and this leads them to affiliate with and emulate the personalities, images, behaviors, and preferences of those that they would like to become. During the teenage years, relationships with family members often take a back seat to peer groups and appearance. Teens crave to identify with their peer group, achieve social approval, and become "popular." Many teens feel deep insecurity and are self-conscious. They feel people are constantly focused on them, examining them, and judging them about everything they say and do. They struggle with the inexorable desire to be accepted and admired by their teen peers, and their biggest fear is to not fit in. This myopic desire to fit in predisposes teenagers to frequently engage in upward social comparison processes, that is, identifying and observing others that appear to be experiencing more positive outcomes, and consequently feeling worse about themselves and their own perceived shortcomings.

63.     Today's adolescents are part of Generation Z (which is loosely defined as people born between 1997 and 2012)—they are the first generation of consumers to have grown up in an entirely post-digital era, and thus are "digitally native." The oldest members of this demographic cohort are just turning 24 this year; however, the substantial majority are believed to be still going through adolescence. Members of Generation Z spend upwards of 3 hours per day on the internet, and another 3 hours per day using social media. According to a 2018 survey by Pew Research Center, 45 percent of high school students said they used a social-media platform daily, and 24 percent said that they were online "almost constantly."[17]

64.     One way that Defendants addict minors is when minors use design features such as Meta's "likes," which cause their brains to release euphoria-causing dopamine. However, as soon as

---

[17] Monica Anderson & JingJing Jiang, *Teens, Social Media and Technology*, Pew Research Center (February 3, 2022), https://www.pewresearch.org/internet/2018/05/31/teens-social-media-technology-2018/.

COMPLAINT

dopamine is released, their euphoria is countered by dejection: minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated. In normal stimulatory environments, neutrality is restored after this dejection abates. However, Meta's algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. Each of Defendants' platforms have similar product features that virtually have the same effect as Meta's.

65.    Eventually, as this pattern continues over a period of days, weeks, and months, the neurological baseline to trigger minor users' dopamine responses increases. Minors then continue to use these platforms, not for enjoyment, but simply to feel normal. When minor users attempt to stop using Defendants' social media products, they experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

66.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder. Gaming addiction is a recognized in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (used by mental health professionals to diagnose mental disorders) and is a recognized mental health disorder by the World Health Organization and International Classification of Diseases. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

a.    Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or use is not possible (sadness, anxiety, irritability).

b.    Tolerance, the need to spend more time using social media to satisfy the urge.

c.   Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.   Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.   Continuing to use social media despite problems.

f.   Deceiving family members or others about the amount of time spent on social media.

g.   The use of social media to relieve negative moods, such as guilt or hopelessness; and

h.   Jeopardizing school or work performance or relationships due to social media usage.

67.   Defendants' advertising profits are directly tied to the amount of time that its users spend online. Thus, Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform, in part by directing them to content that is progressively more stimulating. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

68.   Defendants' products could feasibly report the frequency and duration of their minor users' screen time to their parents at negligible cost. This would enable parents to track the frequency, time, and duration of their minor child's social media, identify and address problems arising from such use, and better exercise their rights and responsibilities as parents.

69.   Social comparisons on social media are frequent and are especially likely to be upward, as social media provides a continuous stream of information about other people's

COMPLAINT

accomplishments.[18] Past research suggests that social comparisons occur automatically; when individuals encounter information about another person, their own self-perceptions will be affected. The sheer number of posts in a News Feed, each offering a thumbnail sketch of each person's carefully curated and predominantly ostentatious content, yields numerous opportunities for social comparison. Although people do not typically post false information about themselves online, they do engage in selective self-presentation and are more likely to post eye-catching content. As a result, individuals browsing their News Feeds are more likely to see posts about friends' exciting social activities rather than dull days at the office, affording numerous opportunities for comparisons to seemingly better-off others. Individuals with vacillating levels of self-esteem and certitude, characteristics notoriously endemic to the teenage cohort, are particularly oriented to making frequent and extreme upward social comparisons on social media, which in turn threatens their mental health. Social-media-induced social comparison often results in a discrepancy between the ideal self and the real self, thus evoking a sense of depression, deprivation, and distress, resulting in an overall aggravation of one's mental state.[19] Since the early 2000s, studies have shown that frequent upward social comparison results in lower self-

---

[18] Jin Kyun Lee, *The Effects of Social Comparison Orientation on Psychological Well-Being in Social Networking Sites: Serial Mediation of Perceived Social Support and Self-Esteem* , Current Psychology (2020), https://link.springer.com/content/pdf/10.1007/s12144-020-01114-3.pdf.

[19] This schism between the ideal self and the real self, and the attendant dissatisfaction with reality, is further exacerbated by Meta's use of physical-augmentation technology, which allows users to utilize photo and video filters to make remove blemishes, make the face appear thinner, and lighten the skin-tone, all to make themselves appear more "attractive."

Appearance-altering filters are widely-used across Defendants' platforms. Many filters are designed to make users appear more attractive, according to criteria developed by Defendants—they remove blemishes, make the face appear thinner, and lighten skin-tone. Especially in combination with the platforms' general-feed algorithm, these filters can cause users to make false comparisons between their real-life appearances and the appearances of the people they see in Facebook and Instagram content. These features can also cause users to make negative comparison between their appearance with a filter and without one. As discussed below, Meta has long been aware of the harm these features can cause.

COMPLAINT

esteem and reduced overall mental health.[20] It has also long been known that individuals who are more likely to engage in self-comparison are likewise more likely to have negative outcomes when using social media. To cope with wavering self-esteem, digitally native adolescents often become envious of others and resort to cyberbullying to deconstruct the point of comparison's perceived superiority and preserve an increasingly delicate ego. These natural dynamics in youth are exacerbated to psychologically injurious levels by Defendants' platforms' progressively toxic environment, which is discussed in further detail below.

70.    Defendants' products contain image altering filters that cause mental health harms in multiple ways.[21] First, because of the popularity of these editing tools, many of the images teenagers see have been edited by filters and it can be difficult for teenagers to remain cognizant of the use of filters while viewing content, resulting in a false reality where all other users on the platforms appear better looking than they are in fact, often in an artificial way. By comparing their real-life appearance to the edited appearance of others online, teen's perception of their physical features becomes negative.  Second, teenagers often prefer the way they look using filters, noticing an increase in interaction and positive responses when their photos are edited with filters. Many young users believe they are only attractive when their images are edited, not as they appear naturally. Third, the specific changes filters make to individuals' appearance can cause negative obsession or self-hatred surrounding aspects of their appearance.  The filters alter specific facial

---

[20] Claire Midgley, *When Every Day is a High School Reunion: Social Media Comparisons and Self-Esteem* (2020), https://www.researchgate.net/publication/342490065_When_Every_Day_is_a_High_School_Reunion_Social_Media_Comparisons_and_Self-Esteem.

[21] Anna Haines, *From 'Instagram Face' To 'Snapchat Dysmorphia': How Beauty Filters Are Changing The Way We See Ourselves*, Forbes (Apr. 27, 2021 at 1:19 PM EDT), https://www.forbes.com/sites/annahaines/2021/04/27/from-instagram-face-to-snapchat-dysmorphia-how-beauty-filters-are-changing-the-way-we-see-ourselves/?sh=3c32eb144eff.

COMPLAINT

features such as eyes, lips, jaw, face shape, face slimness, etc, features that often require medical intervention to alter in real life.

71.     In a 2016 study, 52 percent of girls said they use image filters every day, and 80 percent have used an app to change their appearance before the age of 13.[22] In fact, 77 percent of girls reported trying to change or hide at least one part of their body before posting a photo of themselves and 50 percent believe they did not look good without editing.[23] Filters, especially in combination with other product features, directly cause body image issues, eating disorders, body dysmorphia, and related issues.[24] As one study of 481 university students found, spending more time viewing selfies can increase dissatisfaction with one's own face, spending more time looking at selfies (and reviewing their likes and comments) can cause users to draw more comparisons between themselves and others, prompting even more self-criticism.[25] Relatedly, a

---

[22] *Id.*

[23] Haines, *supra* note 36 ("In October, Instagram announced that it would be removing "all effects associated with plastic surgery" from its filter arsenal, but this appears to mean all effects explicitly associated with plastic surgery, such as the ones called "Plastica" and "Fix Me." Filters that give you Instagram Face will remain.").

[24] *See* Sian McLean, Susan Paxton, Eleanor Wertheim, & Jennifer Masters, *Photoshopping the selfie: Self photo editing and photo investment are associated with body dissatisfaction in adolescent girls*, 48 Int'l J. of Eating Disorders 1132, 1133 (Aug. 27, 2015), https://pubmed.ncbi.nlm.nih.gov/26311205/ (presenting a 2015 study involving 101 adolescent girls, more time spent editing and sharing selfies on social media raised their risk of experiencing body dissatisfaction and disordered eating habits.); Jing Yang, Jasmine Fardouly, Yuhui Wang, & Wen Shi, *Selfie-Viewing and Facial Dissatisfaction among Emerging Adults: A Moderated Mediation Model of Appearance Comparisons and Self-Objectification*, 17 Int'l J. of Env't Res. and Pub. Health 672, 672 (Jan. 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7013747/; Scott Griffiths, Stuart Murray, Isabel Krug, & Sian McLean, *The Contribution of Social Media to Body Dissatisfaction, Eating Disorder Symptoms, and Anabolic Steroid Use Among Sexual Minority Men*, 21 Cyberpsychology Behavior, and Soc. Networking 149, 149 (Mar. 1, 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5865626/.

[25] Yang et al., *supra* note 39.

psychodermatologist stated, "these apps subconsciously implant the notion of imperfection and ugliness generating a loss of confidence."[26]

72.    In another recent study, even users that report a higher initial level of self-esteem, felt they looked 44 percent worse before their image was edited using a filter. When a filter increases a gap between how individuals want to look and how they feel they actually look, it "reduces their self-compassion and tolerance for their own physical flaws."[27]

73.    The dangers associated with teenager's proclivity to engage in protracted upward social comparison while on social media is compounded by Defendants deft and discreet construction of an atmosphere capable of exploiting the impulse control issues of even the most mature adults, thereby unleashing upon the public a product that is predictably highly addictive. Meta's products, in particular, have key components that make the platforms highly addictive, including IVR and its Facial Recognition System ("FRS"). Upon information and belief, each of Defendants' products utilize similar technology.

74.    Other psychological manipulations used to intertwine social media users include, but are not limited to: (1) the FRS system, which has already collected for distribution to various third-parties a billion individual facial recognition templates and is otherwise used by Meta to identify and tag people in photos;  (2) how Meta, in particular, uses wavy dots to reflect that someone is currently writing you a message, which is designed to keep you on the platform until you receive the message or shorten the time for you to return and check for a message; and (3) the concept of social reciprocity, a variance of quid pro quo, pursuant to which Meta alerts you when

---

[26] Genesis Rivas, *The Mental Health Impacts of Beauty Filters on Social Media Shouldn't Be Ignored – Here's Why*, InStyle (Sept. 14, 2022 at 2:05PM), https://www.instyle.com/beauty/social-media-filters-mental-health.

[27] Ana Javornik, Ben Marder, Marta Pizzetti, & Luk Warlop, *Research: How AR Filters Impact People's Self-Image*, Harvard Business Review (December 22, 2021), https://hbr.org/2021/12/research-how-ar-filters-impact-peoples-self-image.

COMPLAINT

someone has read your message, which encourages the receivers to respond—because the sender knows the message has been read—and simultaneously prompts the sender to return to check for the seemingly inevitable response. In sum, this perilous amalgamation of intense psychological vulnerability and targeted exploitation foreseeably results in an increased risk of a variety of harms for today's youth, including, but not limited to, social media addiction, withdrawal—from friends, family, and social and academic advancement—lack of focus, anxiety, body dysmorphia, eating disorders, death resulting from eating disorders, depression, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, self-harm, and suicide among other harms.

**B.    Unknown and Innumerable Product Defects**

75.    Upon information and belief, all three of Defendants' platforms (Facebook, Instagram, and TikTok) , have been designed, maintained, and constantly updated by some of the most wealthy, powerful, and sophisticated corporations in the world.  Large teams of expert data scientists, user experience ("UX") researchers, and similar professionals have spent years fine tuning each platform to addict users. Every aspect of each platforms' interface, each layer of its subsurface algorithms and systems, and each line of underlying code, has been crafted by extraordinarily brilliant minds. Every detail – the color of app icons, the placement of buttons within the interface, the timing of notifications, etc. – is designed with the goal of increasing the frequency and length of use sessions. Therefore, it is impossible to create a comprehensive list of addictive, harm-causing defects in the platforms until in-depth discovery takes place. Many product features, such as the innerworkings of algorithms, are secret and unobservable to users. Discovery throughout litigation will support further elaboration regarding the specifics of product defects.

76.    However, across all platforms, features that make the products addictive and likely to cause the mental and physical health harms include, but are not limited to: (1) engagement-

based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) limits to content length, (6) notifications, (7) interface design decisions (such as button placement), (8) autoplay, (9) hand-reflex conditioning UX design, (10) content stockpiling (such as "saving" videos in TikTok), (11) the interaction of these features.[28]; and (12) other features of the platform which are currently unknown and hidden from users and governments.

77.     Many of these features take advantage of psychological principles such as "loss aversion' (the principle that people prefer avoiding losses to acquiring equivalent gains), the "sunk cost fallacy" (the more people invest in something, the more likely that are to continue that behavior), and gamification ("The application of typical elements of game playing (e.g., point scoring, competition with others, rules of play) to other areas of activity, typically as an online marketing technique to encourage engagement with a product or service.").[29]

## C.   Defendants Knowingly Exploit Teenage Vulnerabilities for Unjust Gain

78.     Enacted in 1998 and finalized by a U.S. Federal Trade Commission rulemaking in 2000, the Children's Online Privacy Protection Act, or "COPPA," regulates the conditions under which commercial web sites that either target children under age 13 or have actual knowledge of children under age 13 using their site can collect and use information about them. As a result of

---

[28] The features have a distinct and harsher impact when they interact – for example, becoming addicting to Instagram through variable rewards lengthens use time and increases the impact of harmful beauty standards from "pretty" filters.

[29] *Gamification*, Ascio, https://ascio.ca/gamification (last visited Sept. 20, 2022).

COMPLAINT

COPPA, website operators must obtain "verifiable parental consent" from parents prior to the collection and use of information about children under age 13. Defendants have chosen to avoid these obligations by purporting to ban all those younger than 13 through its terms of service.

79. Defendants state that children under the age of thirteen are prohibited from using their products, but Defendants knowingly lack effective age-verification protocols. To date, this problem has largely been unaddressed. For example, since at least 2011, Meta has known that its age-verification protocols are largely inadequate, then estimating that it removes 20,000 children under age 13 from Facebook every day. Meta claims to have removed at least six hundred thousand underage users in 2021. However, Zuckerberg himself has stated that, notwithstanding the spirit of COPPA, younger children should be allowed to get on Facebook.

**D. Defendants' Business Models Encourage Problematic Use to Maximize Screen Time, Thereby Increasing Revenue**

80. Defendants advertise their products as "free," because they do not charge their users for downloading nor using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention, acquire this data, and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. Defendants design features are not necessary to maximize the communicative utility of the applications, but instead seek to exploit users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards (including things like "likes," "followers," "views," "streaks," "trophies," "charms," etcetera. Defendants use unknown and changing incentives that are designed to prompt users to

COMPLAINT

consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. These designs conform to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time. This design is akin to a slot machine but marketed toward minor users who are even more susceptible than gambling addicts to Defendants' variable reward and notification systems. Instagram's "pull to refresh" is also based on how slot machines operate. This Instagram feature creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities. According to industry insiders and whistleblower(s), Defendants have employed a multitude of psychologists and engineers to help make their products maximally addicting.

81.    Defendants did not warn users of the addictive designs of their products. To the contrary, Defendants actively conceal the dangerous and addictive nature of their platforms, consistently minimizing in public statements and in advertising the negative effect that the products have on users.

**E.    Plaintiff Expressly Disclaims Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

82.    Plaintiff seeks to hold Defendants accountable for their own alleged acts and omissions. Plaintiff's claims arise from Defendants' status as the designer and marketer of dangerously defective social media products, not as the speaker or publisher of third-party content.

83.    Plaintiff alleges that Defendants failed to warn minor users and their parents of known dangers arising from anticipated use of their social media platforms. None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third-party's words.

Plaintiff's claims seek to hold Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any attempts by Defendants to restrict access to objectionable content.

84.    Plaintiff is not alleging that Defendants are liable for what third parties have said, but for what Defendants did or did not do.

85.    None of Plaintiff's claims for relief set forth herein require treating Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiff seeks to hold Defendants liable for their own speech, deliberate decisions, and their own silence in failing to warn of foreseeable dangers arising from the anticipated use of their products. Defendants could manifestly fulfill their legal duty to design reasonably safe products and furnish adequate warnings of foreseeable dangers arising out of their products, without altering, deleting, or modifying the content of a single third-party post or communication.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

86.    Plaintiff D.M. is a seventeen year old male who has been a heavy user of Defendants' platforms.

87.    Shortly after registering to use Defendants' platforms, Plaintiff began engaging in addictive and problematic use of the platform(s). D.M.'s interest in any activity other than viewing and posting on Defendants' platforms progressively declined.

88.    Prompted by the addictive design of Defendants' platforms, and the constant notifications that Defendants' platform(s) pushed to D.M. 24 hours a day, D.M. developed a compulsion to engage with Defendants' platforms, and began getting less and less sleep.

89.    As a proximate result of his compulsion to interact with Defendants' platforms, and specifically due to recommendations and content Defendants selected and showed to D.M., a minor user of Defendants' platforms, D.M. subsequently developed injuries including, but not

COMPLAINT

limited to, social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

90.    Defendants have designed their platforms, including through the use of disappearing or time-sensitive messaging features, to frustrate parents like Veronica Hicks from exercising their rights and duties as parents to monitor and limit their children's use of Defendants' platforms.

91.    Defendants have designed their platforms to allow minors to use, become addicted to, and abuse their products without the consent of the users' parents, like Veronica Hicks.

92.    Defendants have specifically designed their platforms to be attractive nuisances to underage users but failed to exercise the ordinary care owed to underage business invitees to prevent the rampant, foreseeable, and deleterious impact on minor users that access Defendants' platforms.

93.    Neither Veronica Hicks nor D.M. were aware of the addictive and mentally harmful effects of Defendants' platforms when D.M. began to use the products. Defendants not only failed to warn D.M. and Veronica Hicks of the dangers of social media compulsion, sleep deprivation, and problematic use of Defendants' platforms, but misrepresented the safety, utility, and non-addictive properties of their products. For example, the head of Instagram testified under oath at a December 8, 2021, Senate Committee hearing that Instagram does not addict its users. Indeed, Meta intentionally designed Facebook and Instagram to elicit intermittent dopamine releases within users' brains, a behavior modification scheme devised to surreptitiously ensnare users in an infinite loop of platform use and dopamine withdrawal:

COMPLAINT

When Facebook was getting going, I had these people who would come up to me and they would say, 'I'm not on social media.' And I would say, 'OK. You know, you will be.' And then they would say, 'No, no, no. I value my real-life interactions. I value the moment. I value presence. I value intimacy.' And I would say . . . 'We'll get you eventually.' I don't know if I really understood the consequences of what I was saying, because [of] the unintended consequences of a network when it grows to a billion or 2 billion people and . . . it literally changes your relationship with society, with each other . . . It probably interferes with productivity in weird ways. God only knows what it's doing to our children's brains. The thought process that went into building these applications, Facebook being the first of them . . . was all about: 'How do we consume as much of your time and conscious attention as possible? And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you . . . more likes and comments.' It's a social-validation feedback loop . . . exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators—it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people—understood this consciously. And we did it anyway.

Ellie Silverman, *Facebook's First President, on Facebook: "God only knows what it's doing to our children's brains"* (November 9, 2017, last visited July 29, 2022, at 1:54 PM CST) https://www.washingtonpost.com/news/the-switch/wp/2017/11/09/facebooks-first-president-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains/ .

94.    As a result of D.M.'s extensive and problematic use of Defendants' platforms, he has developed numerous health conditions that he still struggles with until this day.

COMPLAINT

## VI.    CAUSES OF ACTION

## FIRST CAUSE OF ACTION—ALL DEFENDANTS

## <u>STRICT LIABILITY—DESIGN DEFECT</u>

95.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

96.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

97.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

98.    Defendants' products were designed and intended to be used as social media platforms.

99.    Defendants' products as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons enumerated in the Complaint, including, but not limited to, risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, Attention Deficit Hyperactivity Disorder ("ADHD"), difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

100.    Defendants defectively designed the platforms to specifically appeal to and addict minors and young adults, who were particularly unable to appreciate the risks posed by the platforms, and particularly susceptible to harms from those products.

COMPLAINT

101.    Defendants effectively designed the platforms to be addictive and take advantage of the chemical reward system of users' brains (especially young users) to create addiction and additional mental and physical health harms.

102.    Defendants defectively designed their platforms, which are inherently dangerous because they included features making the product addictive and likely to cause the mental and physical health harms listed above. These features include, but are not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) limits to content length, (6) notifications, (7) interface design decisions (such as button placement), (8) autoplay, (9) hand-reflex conditioning UX design, (10) content stockpiling (such as "saving" videos in TikTok), (11) the interaction of these features.[30]; and (12) other features of the platform which are currently unknown and hidden from users and governments.

103.    Defendants defectively designed the platforms and Defendants failed to test as to the safety of features they developed and implemented for use in the platforms. Once Defendants did perform some product testing and had knowledge of ongoing harm to Plaintiff, they failed to adequately remedy the product defects or warn Plaintiff.

---

[30] The features have a distinct and harsher impact when they interact – for example, becoming addicting to Instagram through variable rewards lengthens use time and increases the impact of harmful beauty standards from "pretty" filters.

COMPLAINT

104.    Defendants' products do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. Defendants' products pose a risk of serious mental and physical health injuries as listed above.

105.    The risks inherent in the design of Defendants' products significantly outweigh any benefits of such design.

106.    Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products without the harm causing features listed above, that were less addictive, less likely to cause mental health harms, while still providing an optimal social media experience and facilitating social connection.

107.    Defendants could have limited the duration of login sessions to prevent harmful, extended use of the platforms and could have designed the platforms to logout for a period of time if excessive use occurred. It is well established in research that to effectively stay connected socially, a person only needs a limited amount of use time.  Instead, Defendants designed a product that uses behavioral engineering to maximize the number of use sessions and length of use per session, resulting in serious harm to Plaintiff.

108.    Defendants could have used technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underage from using the platforms, or other youth protecting features.

109.    Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, including, but not limited to:

   a.  Designing platforms that did not include the features listed above while still fulfilling the social interest, and business networking purposes of a social media platform;

COMPLAINT

b.  Default protective limits to length of use, frequency of use, or content types;

c.  Opt-in restrictions to length of use, frequency of use, or content types;

d.  Session time limits;

e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

f.  Session time notifications, warnings, or reports;

g.  Warning of health effects of use and extended use upon sign-up;

h.  Parental controls;

i.  Notification to parents regarding their child's extensive use, use during sleep hours, or exposure to harmful content on the platform,

j.  Self-limiting tools;

k.  Implementing labels on images and videos that have been edited through the platform;

l.  Age-based content filtering;

m.  General content filtering;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (*e.g.*, content that causes negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content, such as inappropriate or salacious content;

COMPLAINT

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

q.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

r.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic recommendation, presentation, and sorting;

s.  Chronological presentation of content rather than algorithmic; and

t.  Many other less harmful alternatives.

110.  Instead, Defendants designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Defendants, all to the detriment of users' wellbeing.

111.  It is reasonable for parents to expect that social media products that actively promote their platforms to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive, occurs during sleep time, or exposes the child to harmful content. Defendants could feasibly design the products to identify minor users who are using the product excessively, using it during sleeping hours, or being exposed to harmful content, and notify their parents, at negligible cost.

112.  Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of

viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

113.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

114.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Defendants' algorithms also promote controversial, disturbing, negative, and/or emotionally-charged content, causing harm to users.

115.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

116.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such

COMPLAINT

as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become highly addictive and as difficult to stop engaging with as possible.

117.    Defendants failed to design the product with adequate warnings about the likely and foreseeable harms of use.

118.    Plaintiff used Defendants' products as intended or in reasonably foreseeable ways. Defendants specifically intended for minors to use its products and were aware that minors were doing so.

119.    Plaintiff's injuries—physical, emotional, and economic—were reasonably foreseeable to Defendants at the time of the products' design, marketing, and operation.

120.    Defendants' products were defective and unreasonably dangerous when they left Defendants' sole possession/control and were offered to users. The defects continued to exist through use by consumers, including Plaintiff, who used the products without any substantial change in the products' condition.

121.    Plaintiff was injured as a direct and proximate result of the platform's defective design as described herein. The defective design of Defendants' products was a proximate cause of Plaintiff's harms.

122.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the social media induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

COMPLAINT

## SECOND CAUSE OF ACTION—ALL DEFENDANTS
## STRICT LIABILITY—FAILURE TO WARN

123.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

124.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

125.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

126.    Defendants' products were and are in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn users about the risk that the platforms pose of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein.

127.    Defendants were aware that their products posed, among other things, the above-stated risks considering scientific and medical knowledge that was generally accepted at the time of design, development, coding, dissemination, public release, and operation of platforms.

128.    For example, Defendants failed to warn consumers, including Plaintiff, in the platforms' notices and through the marketing, promotion and advertising of the platforms that, according to Meta's own research:

COMPLAINT

a.   At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.   Facebook makes body-image issues worse for one-third of girls;

d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f.   Instagram users are twice as likely to develop an eating disorder as those who do not use social media.

129.   Meta, in particular, is also defective for failing to warn users that:

a.   Engagement-based ranking and intermittent variable rewards are

   i.   highly addictive,

   ii.   promote harmful social comparison,

   iii.   promote negative, controversial, and/or emotionally activating content,

   iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v.   encourage bullying and conflict,

   vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm,

COMPLAINT

vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

i.    inflict unrealistic and biased beauty standards upon users,

ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

130.    Through their incredible power as the premier social media companies (and/or association with such companies), Defendants have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

131.    Rather than warning users of likely harms, Defendants regularly fine-tune the platforms to aggressively psychologically engineer new and current users to increase addiction and exposure to the platforms, causing and increasing other mental and physical harms. The platforms encourage users to recruit more users across their personal contacts.

COMPLAINT

132.    The failure of Defendants to adequately warn about their defective products and choice to instead misleadingly advertise through conventional, online, and peer-to-peer avenues created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, dissemination, and operation of the platforms.

133.    Ordinary consumers would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to Defendants.

134.    Defendants are strictly liable for creating, operating, and unleashing defective platforms that contained inadequate warnings.

135.    Plaintiff could not have averted injury through the exercise of reasonable care for reasons including Defendants' concealment of the true risks posed by Defendants' products.

136.    The defects in Defendants' products, including the lack of adequate warnings and instructions, existed at the time the products left Defendants' sole possession and continued to exist through the products' dissemination to and use by consumers, including Plaintiff. Defendants' products were used without substantial change in their condition, by anyone other than Defendants and its employees, from the time of their development.

137.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sign-up, and at various intervals of the user interface.

138.    Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because he would not have used or signed up on Defendants' products had he received adequate warnings and instructions that he could be harmed by platform design that hijacks a user's neural reward system, develop an addiction, be exposed to an algorithmic content feed causing

negative social and appearance comparison and a negative false presentation of reality, and suffer injuries including social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

139.    The platforms' lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was the proximate cause and/or a substantial contributing factor in causing the harm to Plaintiff.

140.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, fees, and all such other relief as the Court deems proper.

### THIRD CAUSE OF ACTION—ALL DEFENDANTS
### STRICT LIABILITY—MANUFACTURING DEFECT

141.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

142.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this cause of action under all applicable product liability acts, statutes, and laws of the State of Kansas.

143.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

144.    Defendants actively controlled their platforms during the entire period Plaintiff used them, as Defendants expected.

COMPLAINT

145.    Plaintiff used Defendants' products while they were actively controlled by Defendants and any changes or modifications to the conditions of those platforms were foreseeable by these Defendants.

146.    Plaintiff used Defendants' products in a manner intended and/or foreseeable to Defendants.

147.    Defendants' products contained manufacturing defects as developed by Defendants and as placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

148.    Without limitation, examples of Defendants' inadequate development, management, operation, maintenance, testing, and inspecting include:

a.  Failure to follow Good Manufacturing Practices ("GMPs");

b.  Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.  Failure to adequately inspect/test Defendants' products during the development process;

d.  Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e.  Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

COMPLAINT

f.   Failure to timely establish procedures or practices to prevent Defendants' products from having unintended mental and physical health consequences;

g.   Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.   Failure to test the platforms' output to users given various user inputs;

i.   Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

149.   Plaintiff was injured as a direct and proximate result of the developmental, inspection, coding, programming, testing, monitoring, and operational defects of Defendants' products as described herein.

150.   The defective development, inspection, coding, programming, testing, monitoring, and operation of Defendants' products was a proximate cause of Plaintiff's harms.

151.   Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION—ALL DEFENDANTS
PRODUCTS LIABILITY—NEGLIGENT DESIGN**

152.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

153.   Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

COMPLAINT

resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

154.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

155.    Defendants' products were designed and intended to be used as social media platforms.

156.    Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly so with minors and young adults.

157.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products. Defendants' products are highly addictive and likely to cause mental and physical injuries as listed above.

158.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

159.    Defendants breached their duty by failing to use reasonable care in the design of their platforms because the products were addictive; had mental, cognitive, and physical health impacts; and had a likelihood of causing social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

COMPLAINT

160.    Defendants breached their duty by failing to use reasonable care in the design of their products by negligently designing the platforms with physically and mentally harmful features including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

161.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

162.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

163.    The features combine to create a user interface of endless, auto-playing image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top

and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Defendants' algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

164.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

165.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive, content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

166.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

167.    Defendants breached their duty by failing to use reasonable care in the design of their products by negligently designing the platforms to uniquely appeal to minors, who were particularly unable to appreciate the risks posed by the platforms.

COMPLAINT

168.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less addictive and harmful to minors.

169.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to:

  a.  Designing platforms that did not include the features listed above while still fulfilling the social, interest, and business networking purposes of a social media platform;

  b.  Default protective limits to length of use, frequency of use, or content types;

  c.  Opt-in restrictions to length of use, frequency of use, or content types;

  d.  session time limits;

  e.  Blocks to use during certain times of day (such as morning, during work or school periods, or during evenings);

  f.  Session time notifications, warnings, or reports;

  g.  Warning of health effects of use and extended use upon sign-up;

  h.  Parental controls;

  i.  Self-limiting tools;

  j.  Implementing labels on images and videos that have been edited through the platform;

  k.  Age-based content filtering;

  l.  General content filtering;

COMPLAINT

m.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content (by causing negative social comparison and misleading lack of realism) such as in the genres of lifestyle, influencer, beauty, fitness, success flaunting, and/or heavily edited images and videos;

n.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as inappropriate or salacious content;

o.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as controversial, political, or emotionally weighted content;

p.  Algorithmic (whether default or opt-in) reductions or elimination in a user's feed of potentially harmful content such as content encouraging or promoting eating disorders, depressive thinking, self-harm, or suicide;

q.  Informational labelling about the misleading and unrealistic nature of the content on a user's feed and the resulting feed composite because of content editing and algorithmic presentation/sorting;

r.  Chronological presentation of content rather than algorithmic;

s.  Many other less harmful alternatives.

170.  Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have reduced mental and physical harms to users, especially youth. Instead, Defendants designed platforms that aggressively addict users with algorithms and features that increase addictiveness, use time, frequency of use, attention stealing, engagement with the platform, mental health harms, and profit to Defendants, all to the detriment of users' wellbeing.

COMPLAINT

171.     Defendants breached their duty by failing to use reasonable care by failing to use cost-effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's age verification, restricting those underaged from using the platforms, or other youth-protecting features.

172.     A reasonable company under the same or similar circumstances would have designed a safer product.

173.     Plaintiff was harmed directly and proximately by the platforms Defendants' failure to use reasonable care in the design of their products. Such harm includes social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

174.     The design of Defendants' products was a proximate cause of Plaintiff's harms.

175.     Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### FIFTH CAUSE OF ACTION—ALL DEFENDANTS
### <u>PRODUCTS LIABILITY—NEGLIGENT FAILURE TO WARN</u>

176.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

177.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

COMPLAINT

178.   At all relevant times, the Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

179.   Defendants knew or, by the exercise of reasonable care, should have known use of their products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

180.   Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products. Defendants' platforms are highly addictive and likely to cause mental and physical injuries as listed above.

181.   Defendants knew or, by the exercise of reasonable care, should have known that their products posed risks, including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

182.   Defendants owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of Defendants' products.

183.   Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings in the platforms' sign-up warnings, and through marketing, promoting and advertising of the platforms. For example, according to Meta's own research:

COMPLAINT

      a.   At least five-to-six percent of fourteen-year-olds admit to addiction to Meta's platforms;

      b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

      c.   Facebook makes body-image issues worse for one-third of girls;

      d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

      e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

      f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

184.   Defendants' products are also defective for failing to warn users that, among other things:

      a.   Engagement-based ranking and intermittent variable rewards are:

           i.   highly addictive,

          ii.   promote harmful social comparison,

        iii.   promote negative, controversial, and/or emotionally activating content,

        iv.   promote negative, harmful, and/or dangerous interest groups and/or content creators,

         v.   encourage bullying and conflict,

        vi.   can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

      vii.   present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

  b.  Face tracking and augmentation (image and video filters):

      i.   inflict unrealistic and biased beauty standards upon users, and

      ii.   cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

  c.  The platforms cause the mental and physical health harms as listed above;

  d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

  e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features; and

  f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

185.   The failure of Defendants to adequately warn about its defective products, and its efforts to misleadingly advertise through conventional and social media avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design, development, coding, operation, and dissemination of the platforms.

186.   Through their incredible power as the premier social media companies (and/or association with such companies), Defendants have silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

187.    Rather than warning users of likely harms, Defendants regularly fine-tune the platforms to aggressively socially and psychologically engineer new and ongoing users to increase addiction and exposure to their platforms, causing and increasing physical and psychological harm. The platforms encourage users to recruit more users across their personal electronic contacts.

188.    The failure of Defendants to adequately warn about its defective products—and its efforts to misleadingly advertise through conventional, online, and peer-to-peer avenues—created a danger of injuries described herein that were reasonably foreseeable at the time of design, distribution, and operation of the platforms.

189.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of dissemination/account registration, and at various intervals of the user interface.

190.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

191.    Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because he would not have used Defendants' products had he received adequate warnings and instructions that the platforms could cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

COMPLAINT

192.    Defendants lack of adequate and sufficient warnings and instructions, and its inadequate and misleading advertising, was a substantial contributing factor in causing the harm to Plaintiff.

193.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTH CAUSE OF ACTION—ALL DEFENDANTS
### PRODUCTS LIABILITY—NEGLIGENT MANUFACTURING

194.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

195.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

196.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, controlled, advertised, promoted, and or benefited from the products and platforms that Plaintiff used.

197.    Defendants had a duty to use exercise reasonable care, in the development, coding, operation, maintained, inspecting, testing, and dissemination of their platforms.

198.    Defendants knew or, by the exercise of reasonable care, should have known Defendants' products were carelessly developed, coded, operated, maintained, inspected, tested, and disseminated, and was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

COMPLAINT

199.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized Defendants' products were improperly developed, coded, operated, maintained, inspected, tested, and disseminated.

200.    Without limitation, examples of Defendants' breaching their duty to exercise reasonable care in development, management, maintenance, testing, and inspecting include:

a.    Failure to follow Good Manufacturing Practices ("GMPs");

b.    Failure to inspect and test the computer programming underlying the platforms and features for errors, unintended output, or unintended executed results of a nature that could cause users harm;

c.    Failure to adequately inspect/test their platforms during the development process;

d.    Failure to test the mental and physical health impacts of their platforms and product features, especially in regards to minors;

e.    Failure to implement procedures that would measure and confirm the behavioral and mental health impact of the platforms;

f.    Failure to timely establish procedures or practices to prevent Defendants' products from having unintended mental and physical health consequences.

g.    Failure to test and research the actual user health impact cause by the *interaction* of the algorithm and other harm causing features listed above;

h.    Failure to test the platforms' output to users given various user inputs;

COMPLAINT

i.  Failure to adequately test the user health result of specific computer coding and programs that constitute the platforms and their features.

201.  A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

202.  Plaintiff was injured as a direct and proximate result of the platforms Defendants failure to use reasonable care in the development, coding, operation, maintenance, inspection, testing, and dissemination.

203.  Defendants negligent development, coding, operation, maintenance, inspection, testing, and dissemination of their products was a substantial factor in causing Plaintiff's harms.

204.  Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTH CAUSE OF ACTION—ALL DEFENDANTS
## NEGLIGENCE AND/OR GROSS NEGLIGENCE

205.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

206.  Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

207.  At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

COMPLAINT

and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

208.    Defendants' platforms were the types of products that could endanger others if negligently made or promoted.

209.    Defendants had a duty of reasonable care in designing, manufacturing, coding, inspecting, testing, marketing, advertising, promoting, supplying, disseminating and/or making publicly available the platforms to avoid causing harm to those that used Defendants' products.

210.    Defendants knew, or should have known by the exercise of reasonable care, the risks to users of the platforms, of mental and physical health harms.

211.    Defendants knew, or should have known by the exercise of reasonable care, that minors and young people would be attracted to these products.

212.    Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' products was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

213.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products. Defendants' platforms are highly addictive and likely to cause mental and physical injuries as listed above.

214.    Defendants knew or, by the exercise of reasonable care, should have known that Defendants' products posed risks including the risks of social media compulsion, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other

COMPLAINT

harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

215.    Defendants knew or should have known that Defendants' products needed to be researched, designed, manufactured, coded, programmed, assembled, inspected, tested, marketed, advertised, promoted, operated, managed, maintained, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

216.    Defendants knew or should have known that Defendants' products would cause harm to users if the following features, among others, were included: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes", comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments.

217.    Defendants knew or should have known that engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

218.    Defendants knew or should have known that the collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

219.    Defendants knew or should have known that the features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Defendants algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

220.    Defendants knew or should have known that the combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

221.    Defendants knew or should have known that these features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

COMPLAINT

222.    Defendants knew or should have known that Defendants' products could cause serious risk of harm, particularly to young persons and minors.

223.    Defendants were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

224.    The negligence and extreme carelessness of Defendants includes, but is not limited to, the following:

a.  Failure to perform adequate testing of their platforms prior to marketing to ensure safety, including long-term testing of the product, and testing for physical and mental health injuries;

b.  Failure to warn consumers that Defendants' products had not been adequately tested or researched prior to marketing to ensure safety;

c.  Failure to take reasonable care in the design of Defendants' products;

d.  Failure to use reasonable care in the production/development of Defendants' platforms;

e.  Failure to use reasonable care in the operation of Defendants' products;

f.  Failure to use reasonable care in the coding/assembly of Defendants' products;

g.  Failure to use reasonable care in advertising, promoting, and marketing Defendants' products;

h.  Failure to use reasonable care in the dissemination of Defendants' products without adequate warnings;

COMPLAINT

i. Use of a design that includes features that cause mental and physical harm, including, but not limited to: (1) engagement-based ranking (sorting content on a user's feed based on engagement or "meaningful social interactions" rather than chronology); (2) intermittent variable rewards (a system of "likes," comments, strategically-timed notifications, promoting the content of new users and users who have not posted in a while, among other features); (3) face tracking and augmentation (*i.e.*, photo and video filters designed to make users appear more attractive); (4) endless scrollable content (especially auto-playing video content such as the Instagram "Reels" content feed); (5) the interaction of these features; and (6) other features of the platform which are currently unknown and hidden from users and governments;

j. Use of a design, engagement-based ranking and intermittent variable rewards that Defendants knew or should have known that are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users;

k. Use of design features that Defendants knew or should have known would interact to multiply the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content,

COMPLAINT

increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways;

l.  Use of design features that Defendants knew or should have known would combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithm is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Defendants' algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users;

m.  Use of design features that Defendants knew or should have known would result in presenting to users a false reality—it presents to users a world which is constantly controversial and negative; most other people are exceedingly more attractive than the user, and most other people are more successful and/or competent than the user;

n.  Failure to inspect Defendants' products for proper operation and to avoid addiction, overuse, or mental health harms;

o.  Failure to reasonably and properly test and properly analyze the testing of Defendants' platforms under reasonably foreseeable circumstances;

COMPLAINT

p. Failure to warn consumers about the dangers associated with use of Defendants' products, in that it was unsafe, causes social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects;

q. Failure to subsequently remedy harm-causing features of the platforms after Defendants had actual knowledge of harm to users;

r. Failure to provide any instructions regarding a safe manner, frequency, and length of use of the platforms per day;

s. Failure of Defendants to verify the age of consumers creating accounts and using Defendants' platforms;

t. Failure to recall Defendants' platforms;

u. All other failures, acts and omissions set forth herein.

225. Defendants' acts and omissions constitute gross negligence because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

226. Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

COMPLAINT

227. Based on their strategic and intentional promotion, advertising, and marketing history, Defendants reasonably should have foreseen that young people would try Defendants' products and quickly become addicted to the platforms, resulting in teenagers and young adults developing lifelong addictions. After fine-tuning the product to addict users using features that also result in serious mental health and physical harms, Defendants reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

228. Defendants intentionally created an attractive nuisance to children, but simultaneously failed to provide adequate warnings or safeguards from the harmful effects they knew were occurring.

229. Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

230. Defendants' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

231. Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTH CAUSE OF ACTION—META ONLY
### FRAUD

232. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

COMPLAINT

233.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

234.    At all relevant times, Meta designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

235.    Meta's marketing, promotions, and advertisements contained deceptive and/or misleading statements, implications, images, and portrayals that the platforms were safe, improved social connectivity, and improved the mental and physical health of its users. For example, Meta's investor relations page states that "Facebook's mission is to give people the power to build community and bring the world closer together. People use Facebook to stay connected with friends and family, to discover what's going on in the world, and to share and express what matters to them."[31] In actuality, Meta's products pose a serious risk to users' mental and physical health, which Meta has long known.

236.    Meta's marketing, promotions and advertisements failed to disclose that the platforms, by contrast, were likely to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

---

[31] *Meta          Investor          Relations          FAQs*,          Meta,
https://investor.fb.com/resources/default.aspx#:~:text=Facebook%20Investor%20Relations%3F-
,What%20is%20Facebook's%20mission%20statement%3F,express%20what%20matters%20to%20them          (last
visited Sept. 20, 2022).

COMPLAINT

237.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of Meta's marketing, promotions and advertising of Facebook and Instagram as positive for users mental and physical health.

238.    Meta represented to Plaintiff—via the media, internet, advertising, its website, the platforms themselves, other social media, and promotions—that:

    a.   Facebook and Instagram were safe and were not harmful;

    b.   Facebook and Instagram were positive and beneficial to a users' wellbeing, improved social connectivity, and improved the mental and physical health of its users;

    c.   Long-term, frequent, prolonged use was harmless;

    d.   Facebook and Instagram increased social connectivity, rather than causing feelings of isolation;

    e.   An inaccurate and misleading portrayal of the platforms mental and physical health impact; and

    f.   Other misrepresentations described herein.

239.    Meta omitted/failed to ever inform Plaintiff and other consumers, by any media, that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to Meta's platforms;

COMPLAINT

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.    Facebook makes body-image issues worse for one-third of girls;

a. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

b. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

c. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

240.    Meta also omitted/failed to inform users that, as it knew or should have known:

a. Engagement-based ranking and intermittent variable rewards are:

    i.    highly addictive,

    ii.    promote harmful social comparison,

    iii.    promote negative, controversial, and/or emotionally activating content,

    iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.     encourage bullying and conflict,

    vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

COMPLAINT

> vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);
>
> b.  Face tracking and augmentation (image and video filters):
>
>> i.    inflict unrealistic and biased beauty standards upon users, and
>>
>> ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;
>
> c.  The platforms cause the mental and physical health harms as listed above;
>
> d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors; and
>
> e.  The likelihood and intensity of these harmful effects are exacerbated by the collaboration of these features.

241.    These representations were false and material. These omissions also communicated falsehoods and were material. The platforms are unsafe and were known by Meta to cause mental and physical health harms, especially in youth, such as social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

242.    The above representations were communicated to Plaintiff.

243.    Through their incredible power as the premier social media companies (and/or association with such companies), Meta has silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

COMPLAINT

244.    Meta's conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and, in fact, did deceive reasonable consumers including the Plaintiff. Reasonable consumers, including the Plaintiff, would have found it material to their purchasing decisions that the platforms' products posed unreasonable risks of substantial mental and bodily injury, including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Plaintiff's decisions to purchase and consume Facebook and Instagram.

245.    Meta owed Plaintiff a duty to disclose these facts because they were known and/or accessible exclusively to Meta, who have had exclusive and superior knowledge of the facts; because the facts would be material to reasonable consumers; because the platforms pose an unreasonable risk of substantial mental and bodily injury; and because the platforms made partial representations concerning the same subject matter as the omitted facts.

246.    Plaintiff reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on the platforms' misrepresentations and omissions.

247.    Meta knew or should have known that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions.

248.    Meta's misrepresentations and/or omissions were a substantial factor in causing Plaintiff's harms. Plaintiff was injured as a direct and proximate result of Meta's fraudulent conduct as described herein.

249.    Plaintiff demands judgment against Meta for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow

COMPLAINT

for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINTH CAUSE OF ACTION—META ONLY
### FRAUDULENT CONCEALMENT

250.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

251.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

252.    At all relevant times, Meta designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Facebook and Instagram and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

253.    Meta had a duty to disclose material facts about Facebook and Instagram to Plaintiff.

254.    Meta fraudulently and deceptively marketed Facebook and Instagram to Plaintiff as safe, healthful, or not harmful, and beneficial to user mental health and social connectedness when Meta knew that the truth is just the opposite.

255.    Meta fraudulently and deceptively downplayed or minimized any risk associated with its platforms and product features.  Meta and others worked together to pitch news stories or other media content designed to downplay the risks of its platforms, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds

of doubt and confusion among the public, to initiate new users, to keep customers using Facebook and Instagram, and to avoid regulation or legislative efforts to control Meta.

256.    Through their incredible power as the premier social media companies (and/or association with such companies), Meta has silenced and suppressed information, research efforts, and public awareness efforts regarding the harmful heath impact of their platforms.

257.    Meta fraudulently and deceptively concealed that Facebook and Instagram can cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms.

258.    Meta fraudulently and deceptively concealed they had not adequately researched or tested the platforms and its features to assess its safety before offering it on the market and promoting it to young people and adults.

259.    Meta fraudulently and deceptively concealed that the platforms were powerfully addictive.

260.    Meta further failed to disclose to Plaintiff that the platforms are designed to create and sustain an addiction. Meta also manipulated the platforms algorithms and features in ways that could and would impact their addictiveness and mental health impact, and Meta did so without notifying Plaintiff. Meta actively concealed the innerworkings of its platforms and their mental health impacts.

261.    Meta concealed from Plaintiff that, according to its own research:

   a.   At least five-to-six percent of fourteen-year-olds admit to addiction to Meta's platforms;

COMPLAINT

b. Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c. Facebook makes body-image issues worse for one-third of girls;

d. Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e. Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

f. Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

262. Meta also concealed from Plaintiff that:

a. Engagement-based ranking and intermittent variable rewards are:

   i. highly addictive,

   ii. promote harmful social comparison,

   iii. promote negative, controversial, and/or emotionally activating content,

   iv. promote negative, harmful, and/or dangerous interest groups and/or content creators,

   v. encourage bullying and conflict,

   vi. can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

COMPLAINT

vii.    present a false reality (regarding one's comparative status to their

peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

i.    inflict unrealistic and biased beauty standards upon users, and

ii.    cause harmful social comparison based on a misleading curation of

peers' appearances and success, especially among teenage female

users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even

greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the

collaboration of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other

features and innerworkings of the platforms which are currently publicly

unknown and hidden from users and governments.

263.    Each of these misrepresentations and omissions were material at the time they were

made. Each of the misrepresentations and omissions concerned material facts that were essential

to the analysis undertaken by Plaintiff as to whether to register or use the platforms.

264.    Plaintiff did not know of the facts that Meta concealed.

265.    Meta intended to deceive Plaintiff and the public by concealing these facts.

266.    Meta had a duty to accurately provide this information to Plaintiff. In concealing

this information from Plaintiff, Meta breached their duty. Meta also gained financially from this

concealment, and because of their breach.

COMPLAINT

267. Meta had ample opportunities to disclose these facts to Plaintiff, through advertising, on its websites, platforms, and on other social media. Meta concealed material information at all relevant times, through today. Meta has yet to disclose the truth about Facebook and Instagram.

268. Plaintiff relied to his detriment on Meta's fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed from him regarding the safety of the platforms, and not intentionally deceived by Meta, he would not have signed up for or used Facebook and Instagram.

269. Meta's fraudulent concealment was a substantial factor in Plaintiff's harms as described herein, including: social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

270. Plaintiff was injured as a direct and proximate result of Meta's fraudulent conduct as described herein.

271. Plaintiff demands judgment against Meta for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TENTH CAUSE OF ACTION—META ONLY**
**CONSPIRACY TO COMMIT FRAUD**

272. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

273. Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

COMPLAINT

resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability and conspiracy, statutes, and the common law of the State of Kansas.

274.    Meta entered into an agreement to advance their financial interests by injuring Plaintiff. Specifically, Meta worked in concert to maintain and maximize the number of users addicted to Facebook and Instagram to ensure a steady and growing customer base.

275.    Meta sought to accomplish this objective by: (1) designing products that were intended to addict users to dopamine-triggering stimuli on its electronic platforms (similar to electronic gambling platforms); (2) marketing, advertising, promoting and misbranding that platform to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

276.    Plaintiff's addiction to the platforms was a primary object of the Conspiracy. Meta orchestrated efforts with a unity of purpose to addict this generation of teenagers and young adults to its platforms by way of unlawful conduct in marketing, promoting, manufacturing, designing, and disseminating Facebook and Instagram that substantially contributed to the Plaintiff's injuries as alleged herein.

277.    Meta further conspired with one another by setting out to entice and lure new users of the platforms as a wrongful, unlawful, and tortious means to make a profit.

278.    Meta's conspiracy involved:

    a.    Developing social media platforms to be as addictive as possible, regardless of mental and physical health impacts;

    b.    Suppressing internal and external efforts to research the harmful effects of those platforms;

COMPLAINT

c.  Suppressing internal and external efforts to inform consumers of the harmful effects of those platforms;

d.  Making knowingly false and misleading representations and omissions to government organizations, personnel, legislators, and regulators, including at congressional hearings; and

e.  Engaging in lobbying efforts and political donations to discourage office holders from performing oversight of its platforms.

279.  Meta's conduct violated state law and constituted a conspiracy to harm Plaintiff. Plaintiff brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

280.  Meta's conspiracy to commit fraud was a substantial factor in causing Plaintiff's harms. Plaintiff was injured, as described herein, as a direct and proximate result of Meta's unlawful conspiracy as described herein.

281.  Plaintiff demands judgment against Meta for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### ELEVENTH CAUSE OF ACTION—ALL DEFENDANTS
### UNJUST ENRICHMENT

282.  Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

283.  Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's

COMPLAINT

resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

284.   At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

285.   Defendants concealed from Plaintiff the harms of using their products. For example, Meta concealed that, according to its own research:

    a.   At least five-to-six percent of fourteen-year-olds admit to addiction to Meta's platforms;

    b.   Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

    c.   Facebook makes body-image issues worse for one-third of girls;

    d.   Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

    e.   Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse; and

    f.   Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

286.   Defendants also concealed from Plaintiff that:

    a.   Engagement-based ranking and intermittent variable rewards are:

COMPLAINT

      i.    highly addictive,

     ii.    promote harmful social comparison,

   iii.    promote negative, controversial, and/or emotionally activating content,

   iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

    v.    encourage bullying and conflict,

   vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

  vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b. Face tracking and augmentation (image and video filters):

      i.    inflict unrealistic and biased beauty standards upon users, and

     ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c. The platforms cause the mental and physical health harms as listed above;

d. The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e. The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

COMPLAINT

f.   The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

287.   Defendants received a measurable benefit at the expense of Plaintiff in the form of ad revenue and other revenue derived from consumers use of Defendants' platforms.

288.   Defendants appreciated, recognized, and chose to accept the monetary benefits Plaintiff's registration and use of the platforms conferred onto Defendants at the Plaintiff's detriment. These benefits were the expected result of Defendants acting in their pecuniary interests at the expense of its users.

289.   The harm causing features listed above were the same platform components that increased Defendants' revenue—addiction and overuse of the platforms directly creates increased ad revenue for the company. The benefit to Defendants came directly at the expense of the Plaintiff's time, mental wellness, and physical health.

290.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured because of their wrongful conduct.

291.   Defendants wrongfully obfuscated the harm caused by their conduct. Thus, Plaintiff, who mistakenly enriched Defendants by relying on Defendants' fraudulent representations, could not and did not know the effect that using Defendants' products would have on Plaintiff's health.

292.   Plaintiff is entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Plaintiff to the position he occupied prior to dealing with Defendants. Due to the sprawling, decades-long concern about the impacts of technology and the

COMPLAINT

internet on mental and physical health, and litigation commonly following injuries afflicted using the internet, and other notice they have received because of lawsuits filed against them, Defendants are reasonably notified that Plaintiff would expect compensation from Defendants' unjust enrichment stemming from their wrongful actions.

293.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## TWELFTH CAUSE OF ACTION—ALL DEFENDANTS
## VIOLATION OF UNFAIR TRADE
## PRACTICES/CONSUMER PROTECTION LAWS

294.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

295.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

296.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Defendants' products and therefore owed a duty of reasonable care to avoid causing harm to those that used it, such as Plaintiff.

297.    Plaintiff herein brings a cause of action for consumer fraud and/or unfair and deceptive trade practices and/or unfair business practices under applicable state law.

298.    Defendants are on notice that such claims may be asserted by Plaintiff.

COMPLAINT

299.    Plaintiff registered for and used Defendants' products and suffered injuries because of Defendants' actions in violation of these consumer protection laws.

300.    Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have registered for or used Defendants' products resulting in the injuries as alleged herein.

301.    Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, but are not limited to, the following:

a.    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b.    Advertising goods or service with the intent not to sell them as advertised;

c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion;

d.    Engaging in fraudulent or deceptive conduct that causes actual confusion or misunderstanding as to the approval of certain goods; and

e.    Many other fraudulent, unfair, and/or deceptive as stated elsewhere in this complaint.

302.    Plaintiff was injured by Defendants' unlawful conduct, which was furthered through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying Defendants' products as harmless and beneficial, while misrepresenting or omitting concerns about their mental and physical health impact, addictiveness, and safety.

COMPLAINT

303.    Defendants have a statutory duty to refrain from fraudulent, unfair, and deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of their products. Defendants' deceptive, unconscionable, unfair and/or fraudulent representations and material omissions to Plaintiff constituted consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including, but not limited to, the following:

a.    K.S.A. § 50-623 *et seq.* (Kansas Consumer Protection Act).

304.    Under these and other consumer protection statutes, Defendants are the suppliers, distributors, programmers, manufacturers (developers), advertisers, marketers, promoters and sellers (disseminators) of their platforms, who are subject to liability under such legislation for fraudulent, unfair, deceptive, and unconscionable consumer practices. The actions and omissions of Defendants are uncured or incurable and Defendants were aware of the same well in advance of this filing and failed to take any action to cure their actions or omissions.

305.    Plaintiff justifiably relied to their detriment on Defendants' misrepresentations and omissions in deciding to use Defendants' platforms.

306.    By reason of the fraudulent and unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

307.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

COMPLAINT

## THIRTEENTH CAUSE OF ACTION—ALL DEFENDANTS
## BREACH OF EXPRESS WARRANTY

308.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

309.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

310.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from Defendants' platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

311.    Defendants violated state law for breach of express warranties and Plaintiff herein will bring a cause of action for breach of express warranty under applicable State common law.

312.    Upon information and belief, Defendants expressly warranted through public statements, press releases, advertisements, marketing materials, sign-up notices, clickwrap (and/or browsewrap or scrollwrap), and descriptions that the Defendants' platforms were safe for their intended use and that they were safe for youth to use.

313.    Upon information and belief, Defendants expressly warranted to consumers, like Plaintiff, through written or electronic statements, descriptions, and affirmations of fact on its websites, advertising, and marketing materials that Defendants' products would improve users' mental health, sense of community, and emotional connectedness with others.

COMPLAINT

314.    These affirmations of fact became the basis of the bargain between Defendants and Plaintiff, thereby creating express warranties that Defendants' products would conform to Defendants' affirmations of fact, representations, promises, and descriptions.

315.    As described herein, the platforms actually use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

316.    These express communications contained misrepresentations and failed to warn of the serious and known risks of Defendants' products as alleged herein.

317.    When Defendants made these express warranties, they knew the intended purposes of their platforms and warranted the products to be, in all respects, safe and proper for such purposes.

318.    Defendants authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. Defendants' platforms did not conform to Defendants' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the ordinary purposes for which they were intended.

319.    All of the aforementioned written or electronic materials are known to Defendants and in their possession, and it is Plaintiff's belief that these materials shall be produced by Defendants and made part of the record once discovery is completed.

320.    Defendants' breach of these express warranties were a substantial factor in causing Plaintiff's harms.

COMPLAINT

321.    As a direct and proximate result of Defendants' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

322.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FOURTEENTH CAUSE OF ACTION—ALL DEFENDANTS
## BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

323.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

324.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

325.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

326.    Defendants at all times were merchants with respect to the platforms Defendants provided to Plaintiff and were in the business of programming, developing, disseminating, and operating such products.

327.    Each platform Defendants provided comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

COMPLAINT

328.    The ordinary intended purposes of the platforms—and the purpose for which they are marketed, promoted, and made available—is to serve as safe social media platforms and allow users to connect with friends, create new and palatable association with strangers, and groups online.

329.    The platforms are not fit for that use—or any other use—because they pose significant risks of substantial mental and physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, Defendants' products adversely impact, worsen, or aggravate users' mental health.

330.    Due to these and other features, the platforms are not fit for their ordinary, intended use and Defendants' products are in fact defective and fail to conform to the platforms implied warranties.

331.    Defendants have unlawfully breached the platforms implied warranty of merchantability because their platforms were not in merchantable condition when made available, were defective when made available, and do not possess even the most basic degree of fitness for ordinary use.

332.    Despite having received notice of these defects, Defendants continue to misrepresent the nature of its products and breach its implied warranties.

333.    Plaintiff has had sufficient direct dealings with the platforms Defendants via their websites, apps, platforms, or through retailers acting as agents authorized to distribute Defendants' products (e.g., Apple/the "App Store") to establish privity between the platforms.

334.    Further, Plaintiff was a third-party beneficiary of the platforms' agreements with other entities for the distribution of Defendants' products to consumers. Specifically, Plaintiff is

COMPLAINT

the intended beneficiary of the platforms' implied warranties. The platforms' products are manufactured with the express purpose and intent of being made accessible to consumers.

335.    Plaintiff would not have used Defendants' products, or would not have registered or used on the same terms, had he known the facts these Defendants failed to disclose.

336.    Defendants' breach of these warranties were a substantial factor in causing Plaintiff's harms.

337.    Plaintiff was injured as a direct and proximate result of Defendants' breach of implied warranties of merchantability. Plaintiff has been harmed by Defendants' failure to deliver merchantable products in the form of addiction and other negative health consequences.

338.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION—ALL DEFENDANTS
## FITNESS FOR A PARTICULAR PURPOSE

339.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

340.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

341.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available,

COMPLAINT

and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

342.   Defendants violated state law for breach of implied warranties and Plaintiff herein will bring a cause of action for breach of implied warranty of fitness for a particular purpose under applicable State common law.

343.   Plaintiff intended to use Defendants' products as safe social media platforms and to improve Plaintiff's mental health, sense of community, and emotional connectedness with others.

344.   Defendants knew at that time of account registration, and/or had reason to know, the particular purpose for which the products were required by Plaintiff—as evidenced by Defendants' written and/or electronic statements, descriptions, and affirmations of fact on its websites, print or electronic advertising, marketing materials, sign-up notices, and clickwrap (and/or browsewrap or scrollwrap)—that Defendants' products would improve users' mental health, sense of community, and emotional connectedness with others.

345.   Defendants knew at that time of account registration, and/or had reason to know, that Plaintiff was relying on Defendants' skill or judgment to select or furnish suitable social media platforms.

346.   Defendants did not effectively exclude or modify this implied warranty at any point during users' registration and interface with the platforms.

347.   As described herein, Defendants breached this implied warranty because the platforms use features that cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty

sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harms, which may cause or contribute to additional disease.

348.    Defendants knew the Plaintiff's intended purposes for their platforms and impliedly warranted the products to be, in all respects, safe and proper for such purposes.

349.    Defendants authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. Defendants' products did not conform to Defendants' promises, descriptions or affirmations and were not adequately designed, developed, tested, promoted and/or fit for the particular purposes for which they were intended.

350.    All of the aforementioned written or electronic materials are known to Defendants and in their possession, and it is Plaintiff's belief that these materials shall be produced by Defendants and made part of the record once discovery is completed.

351.    Defendants' breach of these implied warranties were a substantial factor in causing Plaintiff's harms.

352.    As a direct and proximate result of Defendants' breach of these warranties, Plaintiff suffered serious injuries and/or sequelae thereto as alleged herein.

353.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### SIXTEENTH CAUSE OF ACTION—ALL DEFENDANTS
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

354.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

COMPLAINT

355.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

356.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

357.    Defendants knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

358.    Defendants knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

359.    Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' products was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

360.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' products. Defendants' platforms are fine-tuned to addict users, and forcefully cause physical and mental health harms.

361.    Defendants knew or, by the exercise of reasonable care, should have known that their platforms posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus,

ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

362.    Defendants knew or should have known that their platforms needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

363.    Defendants knew or should have known that Defendants' products could cause serious harm, including severe emotional distress, particularly to young persons and minors.

364.    Defendants knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

365.    Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

366.    Defendants' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

COMPLAINT

367.    Defendants acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous, had a great probability of causing severe emotional distress, and in fact resulted in such harm to Plaintiff.

368.    Based on their strategic and intentional promotion, advertising and marketing history, Defendants reasonably should have foreseen that young people would try Defendants' products and quickly become addicted to their platforms, resulting in teenagers and young adults developing lifelong addictions. Defendants were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, Defendants reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, Defendants should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

369.    Plaintiff was injured as a direct and proximate result of the reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

370.    Defendants' conduct, as described above, was intentional, reckless, wanton, malicious, fraudulent, oppressive, extreme, and outrageous, and displayed an entire lack of care and a conscious and depraved indifference to the consequences of their conduct—including to the health, safety, and welfare of their consumers—and warrants an award of punitive damages.

371.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date

COMPLAINT

to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION—ALL DEFENDANTS
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

372.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

373.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

374.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

375.    Defendants knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

376.    Defendants knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

377.    Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' products was harmful and had the potential to cause severe emotional distress when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

378.    Defendants knew or, by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of

COMPLAINT

Defendants' products. Defendants' products are fine-tuned to addict users, and forcefully cause physical and mental health harms.

379.    Defendants knew or, by the exercise of reasonable care, should have known that Defendants' products posed risks including the risks of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of development, dissemination, public release, and operation of the platforms.

380.    Defendants knew or should have known that Defendants' products needed to be researched, designed, manufactured, coded, assembled, inspected, tested, marketed, advertised, promoted, supplied, disseminated, and/or made available properly, without defects and with due care to avoid needlessly causing harm.

381.    Defendants knew or should have known that Defendants' products could cause serious risk of harm, including severe emotional distress, particularly to young persons and minors.

382.    Defendants knew or should have known that many of the youth who were encouraged to use the platforms had preexisting mental health issues and/or eating disorders who were at enhanced risk of harm by utilizing the misleadingly described platforms, which misrepresented the mental health effects of the platforms and failed to warn of the products' features' impacts and risks.

COMPLAINT

383.    Defendants were negligent, reckless, and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm, including severe emotional distress.

384.    Defendants' acts and omissions were extreme and outrageous because they constitute a total lack of care, recklessness, and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm and severe emotional distress to Plaintiff.

385.    Defendants acted with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions were extreme and outrageous had a great probability of causing severe emotional distress and in fact resulted in such harm to Plaintiff.

386.    Based on their strategic and intentional promotion, advertising and marketing history, Defendants reasonably should have foreseen that young people would try Defendants' products and quickly become addicted to their platforms, resulting in teenagers and young adults developing lifelong addictions. Defendants were aware of the risks their platforms posed, as listed herein. After fine-tuning the platforms to be addictive, attention-grabbing, and attention-holding, Defendants reasonably should have foreseen the emotional distress, mental, and physical issues this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them. Particularly, Defendants should have foreseen that young people would be particularly susceptible to experiencing severe emotional distress.

387.    Plaintiff was injured as a direct and proximate result of the negligent, reckless, extreme, and outrageous conduct as described herein. Such harm includes social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

COMPLAINT

388.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### EIGHTEENTH CAUSE OF ACTION—ALL DEFENDANTS
### NEGLIGENT FAILURE TO RECALL/RETROFIT

389.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

390.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

391.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

392.    Defendants knew, or should have known through the exercise of reasonable care, the risks to consumers posed by the platforms and their features.

393.    Defendants knew, or should have known through the exercise of reasonable care, that minors and young people would be attracted to these products.

394.    Defendants knew or, by the exercise of reasonable care, should have known use of Defendants' products was harmful and had the potential to cause social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating

COMPLAINT

disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects, which may cause or contribute to additional disease.

395.    Defendants owed a duty to the users of their products, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available their platforms.

396.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

397.    As discussed, Defendants knew or reasonably should have known that the platforms were dangerous and not safe for use (without added protective measures and/or removal of harm causing features, if at all).

398.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the platforms were defective and unsafe for Plaintiff, who is a person likely to use the platforms for the purpose and in the manner for which the platforms were intended to be used and for purposes reasonably foreseeable to Defendants.

399.    However, at all times, Defendants negligently breached said duties and unreasonably and negligently allowed the platforms to be used by Plaintiff without proper recall or retrofit or warning.

400.    Defendants have also not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the platforms to consumers.

401.    In failing to properly recall and/or retrofit Defendants' products, or even warn of the serious safety risks the platforms pose to consumers and the public, Defendants have failed to

act as a reasonable manufacturer, designer, or distributer would under the same or similar circumstances and failed to exercise reasonable care.

402.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein. Such harm includes social media compulsion, depression, severe anxiety, ADHD, and a reduced inclination or ability to sleep, among other harmful effects, which may cause or contribute to additional disease.

403.    Plaintiff demands judgment against Defendants for compensatory, treble, and punitive damages, medical monitoring to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## NINETEENTH CAUSE OF ACTION—ALL DEFENDANTS
### MEDICAL MONITORING

404.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

405.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state, Kansas. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the State of Kansas.

406.    At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from their platforms, and therefore owed a duty of reasonable care to avoid causing harm to those that used them, such as Plaintiff.

COMPLAINT

407.    Defendants' products cause or exacerbate mental and physical health harms, including, but not limited to, depression, anxiety, suicidal ideation, self-harm, thoughts of self-harm, and eating disorders, among other harmful effects, which may cause or contribute to additional disease.

408.    For example, according to Meta's internal research:

a.    At least five-to-six percent of fourteen-year-olds admit to addiction to the platform;

b.    Sixty-six percent of teen girls and forty-six percent of teen boys have experienced negative social comparisons on Instagram;

c.    Facebook makes body-image issues worse for one-third of girls;

d.    Thirteen-and-one-half percent of teen-girl Instagram users say the platform makes thoughts of suicide and self-injury worse;

e.    Seventeen percent of teen-girl Instagram users say the platform makes eating issues worse;

f.    Instagram users are twice as likely to develop an eating disorder as those who don't use social media.

409.    Defendants' products cause harm by, *inter alia*, the following product effects:

a.    Engagement-based ranking and intermittent variable rewards are:

i.    highly addictive,

ii.    promote harmful social comparison,

COMPLAINT

     iii.    promote negative, controversial, and/or emotionally activating content,

     iv.    promote negative, harmful, and/or dangerous interest groups and/or content creators,

     v.    encourage bullying and conflict,

     vi.    can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, such as content related to eating disorders, depression, or self-harm, and

     vii.    present a false reality (regarding one's comparative status to their peers, and/or the general state of world or political affairs);

b.  Face tracking and augmentation (image and video filters):

     i.    inflict unrealistic and biased beauty standards upon users, and

     ii.    cause harmful social comparison based on a misleading curation of peers' appearances and success, especially among teenage female users;

c.  The platforms cause the mental and physical health harms as listed above;

d.  The likelihood of these harms and likely severity for these harms are even greater for the developing brains of minors;

e.  The likelihood and intensity of these harmful effects are exacerbated by the interaction of these features; and

f.  The likelihood and intensity of these harmful effects are increased by other features and innerworkings of the platforms which are currently publicly unknown and hidden from users and governments.

COMPLAINT

410.    Engagement-based ranking and intermittent variable rewards are highly addictive, promote harmful social comparison, encourage bullying and conflict, can trap users in a cycle of viewing content that is innately harmful or in a manner that is harmful, and present a false reality. Image and video filters inflict unrealistic and biased beauty standards upon users and cause harmful social comparison based on a misleading curation of peers' appearances, especially among teenage female users.

411.    The collaboration of these features multiplies the platforms' power to inflict harm by heightening the platform's addictive nature, increasing exposure to content that triggers negative social comparison, exposing users to innately harmful content, increasing time of exposure to harm, further encouraging bullying and promoting conflict, and multiplying harm in other ways.

412.    The features combine to create a user interface of endless, auto-playing, image and video content, that is algorithmically sorted to place the most attention-grabbing content at the top and/or in a distilled feed that is very difficult to cease consuming, especially for young users. Content that is promoted by the algorithms is often related to beauty, success/wealth flaunting, or lifestyles, which causes negative physical or social comparison, especially among teens. Defendants' algorithms also promote controversial, disturbing, negative, and/or emotionally charged content causing harm to users.

413.    The combined result of these features is to present to users a false reality—it presents to users a world which is constantly controversial and negative; where most other people are exceedingly more attractive than the user; where most other people are exceedingly more successful and/or competent than the user; and which will facilitate and encourage harmful behaviors such as self-harm and eating disorders.

414.    These features take advantage of biological systems, human behavior, and psychology, to addict and condition users to engage in repetitive content-consuming actions such as scrolling, "liking," and sharing content in search of repeated dopamine releases. All the while, the users' input and behavior are tracked to allow the platform to automatically tune itself to each individual user to become as addictive and difficult to stop engaging with as possible.

415.    Potential health harms from these features include, among other types of harm, social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

416.    As a direct and proximate result of Defendants' conduct, Plaintiff has developed mental and physical health issues that will require life-long monitoring treatment.

417.    As a direct and proximate result of Defendants' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future. Such injuries include the development and/or exacerbation of social media addiction, depression, body dysmorphia, anxiety, suicidal ideation, self-harm, thoughts of self-harm, insomnia, eating disorder, anorexia nervosa, bulimia nervosa, death by suicide, death by eating disorder, lack of focus, ADHD, difficulty sleeping, fatigue, headaches, migraines, loss of vision, eye strain, among other harmful effects.

418.    Monitoring procedures exist that makes the early detection and prevention of the above technology-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and psychological testing and treatment.

COMPLAINT

419.    For example, eating disorders can cause hormone/growth problems, heart problems, neurological problems, abnormal cell growth, and cancer. Anxiety can lead to social impairment, relationships, suicide risk, more frequent hospitalizations, substances abuse (prescribed and non-prescribed), unemployment, somatoform. Nearly all the other kinds of harms listed above commonly lead to other health issues.

420.    These procedures are different from that normally recommended in the absence of the exposure. These monitoring procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

421.    Plaintiff has suffered physical, mental, and emotional harms. Anxiety, depression, sleep deprivation, eating disorders (and many of the other harms listed above) are well-known to cause long-lasting conditions, hidden conditions, and health problems that do not manifest fully until much later in life. Existing medical research indicates that these issues can cause permanent digestive tract injury, brain injury, cardiovascular disorders, and many other harms. The injuries such products cause on the human body has already been inflicted in its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the issues Plaintiff has suffered due to use of these platforms.

422.    Plaintiff demand judgment against Defendants for medical monitoring damages to diagnose the platforms induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

COMPLAINT

423.    Such other relief as the Court deems proper.

## VII.    TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

424.    Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that Defendants caused his injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

425.    Plaintiff did not suspect and had no reason to suspect Defendants' platforms caused his injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

426.    In addition, Defendants' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with the defects of Defendants' platforms and that these products caused his injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, Defendants committed continual tortious, and fraudulent acts that continue to this day.

427.    As a result of Defendants' fraudulent concealment, Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that he had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

## VIII.   DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a trial by jury.

COMPLAINT

## IX.     PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants to the full extent of the law, including but not limited to:

1. Entering judgment for Plaintiff and against Defendants;

2. Entering an Order that Defendants are jointly and severally liable;

3. Damages to compensate Plaintiff for injuries sustained as a result of the use of the platforms, including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes, but is not limited to, lost earnings and loss of earning capacity;

4. Awarding actual and compensatory damages;

5. Awarding statutory damages in the maximum amount permitted by law;

6. Awarding exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

7. Awarding reasonable attorneys' fees;

8. Awarding experts' fees;

9. Awarding costs of litigation;

10. Awarding pre-judgment and post-judgment interest at the lawful rate;

11. A trial by jury on all issues of the case;

12. Awarding medical monitoring costs or programs; and

13. Any other relief as this court may deem equitable and just, or that may be available.

COMPLAINT

DATED:  October 27, 2022

**Defendants To Be Served as Follows**:

**Meta Platforms, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Holdings, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Operations, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Payments, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Facebook Technologies, LLC**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Instagram, LLC.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**Siculus, Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

Respectfully Submitted,

*/s/ Joseph G. VanZandt*
Andy D. Birchfield, Jr. (*pro hac vice*)
Jennifer K. Emmel (*pro hac vice*)
Joseph G. VanZandt (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
BEASLEY ALLEN CROW
METHVIN PORTIS & MILES, LLC
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Andy.Birchfield@BeasleyAllen.com
Jennifer.Emmel@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com

*Attorneys for Plaintiff*

COMPLAINT

**ByteDance Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

**TikTok Inc.**
c/o Corp Service Co.
d/b/a CSC Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, California 95833-3505

COMPLAINT